**Electronically Filed
Supreme Court
SCWC-14-0000352
19-JUL-2016
08:38 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

WILLIAM ERIC BOYD,
Petitioner/Appellant/Appellee/Cross-Appellant,

vs.

HAWAII STATE ETHICS COMMISSION, STATE OF HAWAI'I,
Respondent/Appellee/Appellant/Cross-Appellee.

SCWC-14-0000352

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000352; CIV. NO. 13-1-115)

JULY 19, 2016.

RECKTENWALD, C.J., McKENNA, POLLACK, AND WILSON, JJ., AND
CIRCUIT COURT JUDGE CHANG, IN PLACE OF NAKAYAMA, J., RECUSED

OPINION OF THE COURT BY POLLACK, J.

This case addresses whether the Hawai'i State Ethics

Commission (Commission) had authority to adjudicate proceedings

against a charter school employee for conduct that occurred in

2006 and 2007 involving alleged conflict of interest violations

of the code of ethics contained in Chapter 84 of the Hawai'i

Revised Statutes (HRS).  We conclude that HRS § 84-14 (1993), prescribing a code of conduct related to conflicts of interests for State employees, and HRS Chapter 302B (Supp. 2006 & 2007) (repealed 2012), encompassing comprehensive provisions that provided for charter schools to establish conflict of interest policies and procedures, resulted in conflicting statutory regimes for charter school employees as to standards of conduct involving conflicts of interests.  In light of the inconsistency between these State laws, we hold that, in accordance with HRS § 302B-9(a) (Supp. 2006 & 2007) (repealed 2012), charter school employees were exempt from HRS § 84-14 at the relevant time period in this case.  Accordingly, the Commission did not have the authority to adjudicate proceedings against William Boyd, a charter school employee, for alleged violations of HRS § 84-14 that occurred in 2006 and 2007.  We therefore vacate the judgments of the Intermediate Court of Appeals (ICA) and the Circuit Court of the Third Circuit (circuit court) and the order of the Commission that sustained the violations against Boyd, and we remand the case to the Commission with instructions to dismiss the case.

## I.    BACKGROUND

At the time of the alleged ethics violations in this case, Connections New Century Public Charter School

(Connections) was governed by HRS Chapter 302B, which set forth comprehensive legislation authorizing flexibility and independent authority to charter schools in implementing alternative frameworks with respect to personnel management and the day-to-day functioning of a charter school.[1] See HRS § 302B-1 (Supp. 2006 & 2007) (repealed 2012).  Charter schools, such as Connections, operated independently and separately from public schools under Chapter 302B but were linked to the State Department of Education and Board of Education primarily for administrative purposes.  See, e.g., HRS § 302B-8 (Supp. 2006 & 2007) (repealed 2012) (stating the charter school administrative office shall be attached to the Department of Education "for administrative purposes only"); HRS § 302B-15 (Supp. 2006 & 2007) (repealed 2012) (setting forth the responsibilities of the Department of Education with respect to charter schools and special education services at charter schools).

Connections' Local School Board, comprised mainly of community representatives, served as Connections' centralized governing authority responsible for the administration of the school.  See HRS § 302B-7(a), (c) (Supp. 2006 & 2007) (repealed 2012).  The Local School Board was in charge of financial

---

[1]     HRS Chapter 302B was repealed in 2012 and replaced with HRS Chapter 302D.

3

oversight and decision-making regarding State general funds and federal funds allocated to the school as well as the hiring and firing of charter school employees.  See id.  According to Connections' Principal John Thatcher, the Local School Board essentially directed him as to how he should manage the school.

## A. Connections' Internal Policies and Procedures

During the pertinent time period in this case, Connections, with the assistance of its hired auditors, developed and followed its own internal checks-and-balances procedures with respect to procuring school supplies, materials, and other equipment.  The purchasing procedure incorporated the use of a purchase order form that Connections' administrators had developed.  The purchase order form required the following information: (1) the name and title of the individual making the request (requestor); (2) the name, address, and telephone number of the individual or entity from whom the materials could be purchased (vendor); (3) the school materials desired, including the quantity and pricing; and (4) the name(s) and title(s) of the individual(s) approving the request.

Any employee of Connections could make a request by listing the vendor's information on the purchasing form and then submitting the form to an authorized school official for approval.  The approval process included reviewing the

4

information on the form, checking the school's inventory to ensure that the school did not have the requested materials, and checking with vendors to find the best prices for the requested materials.  Principal Thatcher was required to approve all purchase requests.  When Principal Thatcher was not available to give his approval, William Boyd or Sandra Kelley, as administrative officials at Connections, were authorized to preliminarily approve purchase orders in order to enable expedited purchases, but all preliminary approvals were subject to final approval by Principal Thatcher.  If the purchase involved Title 1 funds, the purchase also required review and approval by the Title 1 Coordinator.[2]  Additionally, Principal Thatcher explained that the Local School Board, through its finance committee, could review his final approval of the purchase order requests.

As an employee of Connections, Boyd was also authorized to submit purchase order requests.  On several occasions during the 2006-2007 school year, Boyd prepared, signed as requestor, or preliminarily approved various purchase order forms for requested school materials.  With respect to a

---

[2]    "Title 1 funds" refer to "federal monies provided to schools with a high level of poverty, and such funds may be used to supplement the school's instructional program."

handful of forms, Boyd listed his wife, Erika Boyd (Mrs. Boyd), as the requestor and/or the vendor.  On two of the forms, Principal Thatcher approved the purchase order by signing his name under the heading "Approved."  On all the other forms, Boyd preliminarily approved the request, usually at the direction of Principal Thatcher, and then Principal Thatcher later reviewed and authorized the order by initialing the form.  For some of the purchase order forms in which Mrs. Boyd was listed as the vendor, a Connections' teacher was the requestor, and Boyd preliminarily approved the order.  The school materials listed on the forms at issue were sold to Connections through Mrs. Boyd and fulfilled by an Amway distributorship co-owned by Boyd and his wife (Amway Business).[3]

        When asked whether it was a concern that Mrs. Boyd was a requestor and Boyd was preliminarily signing off on purchase order forms, Principal Thatcher explained that this situation was quite rare and that it would have been a concern if it had been a common practice.  Principal Thatcher stated that the original charter school statute required that the Board of Education audit Connections every year, which it failed to do.  Thus, beginning in 2006, Connections hired its own auditors, who

_____

[3]    Mrs. Boyd used any accumulated points or bonus checks that the Amway Business earned to purchase school supplies for Connections.

conducted audits and made recommendations to refine the school's checks-and-balances procedures, including the school's purchase order procedures.

Principal Thatcher explained that he sought to instill in Connections' employees that the school needed to get everything at the lowest cost possible. He related that Boyd did a lot of research on the availability of items and vendors and stated that Boyd was very diligent about following the practice of purchasing necessary items at the lowest price possible. Boyd in large part secured his position as Administrative Assistant at Connections because he always followed Principal Thatcher's directions and methods. Principal Thatcher insisted that he could have approved the purchases of the school materials from other vendors, rather than from Mrs. Boyd, and that it was his prerogative to make that decision if the prices had been cheaper.

In 2007, before the start of the school semester, Connections learned of a sudden price increase for its high school lunch services, and it had approximately three weeks to enter into a temporary replacement food services contract. Connections sought vendors, but Principal Thatcher explained that it was difficult to find affordable vendors on short notice. Consequently, Connections contracted with Boyd

Enterprises, a sole proprietorship co-owned by Boyd and his wife, to provide school lunches as Mrs. Boyd had the only competing bid with the Department of Education that would save Connections money.[4]

As part of the procedure for obtaining payment for the school lunches, Boyd Enterprises was required to submit a duly signed and certified Food Service Certificate, or invoice, reflecting the number of school lunches provided and the total amount owed. Principal Thatcher approved payment for the Food Service Certificates, and in his absence, Kelley would do so. Boyd apparently did not have authority to approve the Food Service Certificates and did not participate in the approval procedures as a school official.

From January 25, 2007 to June 21, 2007, Boyd, as the Food Services Manager for Boyd Enterprises, submitted eleven Food Service Certificates to Connections and certified that the number of school lunches stated on the certificates represented the actual number of lunches provided. Kelley signed all the Food Service Certificates, and Principal Thatcher approved each of the payments to Boyd Enterprises. Principal Thatcher indicated that, at the time Connections had contracted with Mrs.

---

[4] The high school lunches provided by Boyd Enterprises were sold for $3.00 each.

Boyd, it was not a concern that Connections was paying Boyd Enterprises in which Boyd was the Food Services Manager. He explained that "we did not see it as a problem" but, after a year or so, in 2008, the hired "auditors advised [Connections] that it would be better if [Boyd] was not involved with the food service program at all, and [Connections] followed the advice of the auditors."

## B. Commission Proceedings

On October 20, 2010, the Commission formally issued a charge against Boyd based on twenty-six counts of violating HRS § 84-14(a) and (d) (1993), involving the purchase of school supplies and lunch services that had occurred approximately three years earlier. Boyd filed an answer to the Commission's charge and requested a formal, contested, open hearing. Nearly seventeen months later, on April 18, 2012, the Commission issued its further statement of alleged violation that charged Boyd with nine counts of violating HRS § 84-14(a),[5] for requesting and approving the purchase of school materials from Amway Business,

---

[5]     HRS § 84-14(a) provides, in relevant part, "No employee shall take any official action directly affecting: (1) A business or other undertaking in which the employee has a substantial financial interest; or (2) A private undertaking in which the employee is engaged as legal counselor, advisor, consultant, representative, or other agency capacity."

9

and eleven counts of violating HRS § 84-14(d),[6] for assisting

Boyd Enterprises in transactions to provide lunches to

Connections.

Boyd filed an answer to the charge and further

statement of alleged violation.  He also filed a motion to

dismiss based on the Commission's lack of jurisdiction,

maintaining that he was not an employee of the State subject to

the code of ethics contained in HRS Chapter 84.[7]  Boyd

additionally contended that he was exempt from Chapter 84

because the legislature intended that local school boards

develop and adopt their own ethics code.  Boyd argued that he

was accountable for his actions to Connections' Local School

---

[6]     HRS § 84-14(d) states in pertinent part:

> No legislator or employee shall assist any person or
> business or act in a representative capacity for a fee or
> other compensation to secure passage of a bill or to obtain
> a contract, claim, or other transaction or proposal in
> which the legislator or employee has participated or will
> participate as a legislator or employee, nor shall the
> legislator or employee assist any person or business or act
> in a representative capacity for a fee or other
> compensation on such bill, contract, claim, or other
> transaction or proposal before the legislature or agency of
> which the legislator or employee is an employee or
> legislator.

HRS § 84-14(d).

[7]     Attached to Boyd's motion to dismiss were the following documents
in which Connections was identified as Boyd's employer: (1) U.S. Department
of Justice Immigration and Naturalization Service Employment Eligibility
Verification Form; (2) Internal Revenue Service Form W-4 (Employee's
Withholding Allowance Certificate); and (3) State of Hawai'i Tax Form HW-4
(Employee's Withholding Allowance and Status Certificate).

10

Board, an autonomous entity under Chapter 302B, and not to the Commission under Chapter 84.

Principal Thatcher submitted a signed, sworn declaration to the Commission, which quoted the portion of Connections' Detailed Implementation Plan that stated as follows:

> The employment, appointment, promotion, transfer, demotion, discharge, and job descriptions of all officers and employees of or under the jurisdiction of the New Century Charter School shall be determined by the New Century Charter School and applicable personnel laws and collective bargaining agreements.
>
> Except as previously stated, the Board of Education or the Superintendent of Education shall not have the power to supervise or control the New Century Charter School in the exercise of its functions, duties and powers.

This portion of the Detailed Implementation Plan described the powers, duties, and responsibilities of Connections and its Local School Board. Additionally, the Detailed Implementation Plan indicated that the Director of Operations of the Local School Board had direct authority over operations and business services, fiscal management and personnel services, and purchasing and audit services. The Commission in response to the motion to dismiss filed a motion for determination that Boyd was subject to the Commission's jurisdiction. The Commission deferred its decision as to whether Boyd was subject to its jurisdiction until the date of the contested case hearing.

At the beginning of the contested case hearing, the Commission granted the motion for determination and denied Boyd's motion to dismiss due to lack of jurisdiction, orally ruling that Boyd was an employee of the State subject to the code of ethics contained in Chapter 84 and to the Commission's jurisdiction. During the hearing, in addition to the circumstances recounted above, Boyd testified that he did not receive any notification, training, or written information from the Commission that the code of ethics applied to him. Boyd also stated that he had done everything within his power to save Connections money. No evidence was presented that Amway Business or Boyd Enterprises overcharged Connections or that the school materials and lunches supplied to Connections were not provided at the best available price.

Following the hearing, the Commission rendered factual findings, which included the following: (1) Connections was a public charter school created pursuant to statute; (2) Connections utilized a purchasing procedure that incorporated the use of a purchase order form it had developed; (3) as part of the purchasing procedure, several administrators were required to review the request, and Principal Thatcher retained final approval authority; and (4) Boyd, an Administrative Assistant at Connections, initially approved several purchase

12

orders, which were subject to final approval by Principal

Thatcher.  The Commission also found that Principal Thatcher and

Kelley had the sole authority to approve payments for the Food

Service Certificates, which reflected the number of school

lunches provided, and that Principal Thatcher approved payments

to Boyd Enterprises for all the Food Service Certificates

submitted.

The Commission determined that the code of ethics

applied to all State employees, except judges and justices,[8] and

that Connections was a State agency as defined in HRS § 84-3

(1993).[9]  The Commission thus concluded that, as an employee of

Connections, a State agency, Boyd was an "employee" as defined

in HRS § 84-3 and was therefore subject to the provisions set

---

[8]    HRS § 84-2 provides

This chapter shall apply to every nominated, appointed, or
elected officer, employee, and candidate to elected office
of the State and for election to the constitutional
convention, but excluding justices and judges; provided
that in the case of elected delegates and employees of the
constitutional convention, this chapter shall apply only to
the enforcement and administration of the code of ethics
adopted by the constitutional convention.

HRS § 84-2 (1993).

[9]    HRS § 84-3 defines "State agency" as including "the State, the
legislature and its committees, all executive departments, boards,
commissions, committees, bureaus, offices, the University of Hawai'i, and all
independent commissions and other establishments of the state government but
excluding the courts."

13

forth in Chapter 84.[10]  Consequently, in its February 8, 2013 "Findings of Fact, Conclusions of Law, and Decision and Order" (Decision and Order), the Commission concluded that Boyd had committed nine violations of HRS § 84-14(a) (Counts 1-9) and eleven violations of HRS § 84-14(d) (Counts 10-20).  The Commission imposed an administrative fine of $500 for each violation, the maximum amount for each violation, totaling a fine of $10,000.

## C. Appellate Proceedings

Boyd appealed the Commission's Decision and Order to the circuit court,[11] contending, inter alia, that the Commission lacked statutory jurisdiction over him because he was not a State employee bound by the code of ethics in HRS Chapter 84 and because the Local School Board was exempt from Chapter 84.  Boyd further maintained that the legislature intended that local school boards develop, adopt, and enforce a separate ethics code from Chapter 84, and therefore Boyd was accountable to Connections' Local School Board, not the Commission.  Boyd

---

[10]    HRS § 84-3 defines "employee" as "any nominated, appointed, or elected officer or employee of the State, including members of boards, commissions, and committees, and employees under contract to the State or of the constitutional convention, but excluding legislators, delegates to the constitutional convention, justices and judges."

[11]    The Honorable Greg K. Nakamura presided.

argued that it would be absurd if Connections' employees were subject to two separate standards of ethical conduct.

In its "Decision and Order Affirming in Part and Reversing in Part Hawai'i State Ethics Commission's Findings of Fact, Conclusions of Law, and Decision and Order" (circuit court Order), the circuit court found that Boyd was a member of a collective bargaining unit, as defined under HRS Chapter 89, such that his employer was the State. Consequently, the circuit court concluded that Boyd was an "employee" under HRS § 84-3 and thus was subject to the code of ethics in Chapter 84. The circuit court affirmed the Commission's determination that Boyd had violated HRS § 84-14(a) (Counts 1-9) but reversed the ruling that Boyd had violated HRS § 84-14(d) (Counts 10-20) as the Commission had failed to make a finding that Boyd received money specifically in exchange for the act of signing the Food Service Certificates on behalf of Boyd Enterprises. Accordingly, the circuit court reduced the administrative fines to $4,500 and entered Final Judgment.

The Commission appealed the circuit court Order and Final Judgment, maintaining that the court erred in reversing its ruling that Boyd had violated HRS § 84-14(d) because the Commission had concluded that Boyd received compensation for signing the Food Service Certificates. Boyd cross-appealed,

15

contending, inter alia, that the Commission lacked statutory jurisdiction over him because he was not a State employee but rather was an employee of Connections' Local School Board. Boyd also argued that the Commission lacked authority over him because during the time of the alleged offenses, charter school employees were governed by HRS Chapter 302B. Boyd further observed that, pursuant to HRS § 302B-7(d)[12] and (e)[13] (Supp. 2006 & 2007) (repealed 2012), Local School Boards were exempt from HRS Chapter 103D (Procurement Code), Chapter 91 (Administrative Procedures Act), and Chapter 92 (Public Meeting Law). Additionally, Boyd suggested that a subsequent amendment to HRS § 302B-7(f) indicated that Connections' Local School Board was exempt from HRS Chapter 84 and that the legislature intended

___

[12]     HRS § 302B-7(d) provided

> Local school boards shall be exempt from chapter 103D, but shall develop internal policies and procedures for the procurement of goods, services, and construction, consistent with the goals of public accountability and public procurement practices. Charter schools are encouraged to use the provisions of chapter 103D wherever possible; provided that the use of one or more provisions of chapter 103D shall not constitute a waiver of the exemption from chapter 103D and shall not subject the charter school to any other provision of chapter 103D.

HRS § 302B-7(d).

[13]     HRS § 302B-7(e) stated in relevant part that "[c]harter schools and their local school boards shall be exempt from the requirements of chapters 91 and 92."

16

that local school boards develop, adopt, and enforce a separate ethics code.

The ICA, in a published opinion, ruled that the Commission had jurisdiction to bring charges against Boyd because he was a State employee and was not exempt from the code of ethics by HRS Chapter 302B. The ICA concluded that Boyd was an employee of the State required to adhere to the code of ethics because (1) he admitted that he was an employee of the Local School Board, which was an "arm of the State," (2) he participated in many of the available benefits of being a State employee, and (3) he self-identified as a State employee on several benefit enrollment forms. The ICA further ruled that Boyd's exemption argument was not supported by canons of statutory construction, and thus was without merit, because the "contrast between the procedural statutes and the Code of Ethics leads to an inference that the latter was not intended to be included within the list of exempted statutes." Additionally, the ICA concluded that the circuit court erred in reversing in part the Commission's Decision and Order as it pertained to Boyd's HRS § 84-14(d) violations because the record adequately supported that Connections' payments to Mrs. Boyd for the lunch services constituted compensation to Boyd, for which Boyd was culpable. Accordingly, the ICA affirmed in part and reversed in

17

part the circuit court's Order and remanded the case to the circuit court to enter final judgment affirming the Commission's Decision and Order.

## II.    STANDARD OF REVIEW

Statutory interpretation is a question of law reviewable de novo.  Estate of Roxas v. Marcos, 121 Hawai'i 59, 66, 214 P.3d 598, 605 (2009) (quoting Capua v. Weyerhaeuser Co., 117 Hawai'i 439, 443, 184 P.3d 191, 196 (2008)).  Statutory construction is guided by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.  And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

Id. (quoting Carlisle v. One (1) Boat, 119 Hawai'i 245, 256, 195 P.3d 1177, 1188 (2008)).

## III.    DISCUSSION

Boyd contends that, based on HRS § 302B-9 (Supp. 2006 & 2007) (repealed 2012),[14] he was exempt from the code of ethics

_____

[14]    HRS § 302B-9(a) provided in relevant part,

(continued. . .)

18

in HRS Chapter 84.  Boyd argues that because charter schools and their local school boards had autonomy and responsibility over the internal policies and procedures relating to personnel management and use of public funds, it would have been inconsistent and duplicative to have subjected charter schools and their employees to Chapter 84.  In essence, Boyd asserts that because Chapter 84 was in conflict with HRS Chapter 302B, Chapter 302B superseded Chapter 84, rendering Boyd exempt from the code of ethics within that Chapter.  Boyd also argues that the subsequent 2011 amendment to HRS § 302B-7(f) reflects that the legislature recognized an actual conflict between Chapter 84 and Chapter 302B and amended Chapter 302B in an attempt to remove the conflict, which was consistent with the legislature's

---

(. . .continued)

> Charter schools shall be exempt from chapters 91 and 92 and all other state laws in conflict with this chapter, except those regarding:
>
> > (1)  Collective bargaining under chapter 89 . . .
> >
> > (2)  Discriminatory practices under section 378-2; and
> >
> > (3)  Health and safety requirements.

HRS § 302B-9(a).

actions regarding other State laws conflicting with Chapter 302B.[15]

The Commission responds that because Boyd had a State constitutional mandate to adhere to the code of ethics pursuant to Article XIV of the Hawai'i Constitution,[16] Boyd could not have opted out of the code of ethics, and Connections' Local School Board could not have exempted him from his constitutionally mandated ethical obligations.[17]  Additionally, the Commission contends that Boyd was not statutorily exempt from the code of ethics.[18]

---

[15]     In his application for writ of certiorari, Boyd also presents the following questions: (1) whether ethics code violations require proof of intent; (2) whether the ICA "overturned" Tangen v. State Ethics Commission, 57 Hawai'i 87, 550 P.2d 1275 (1976) without basis; and (3) whether the Commission violated Boyd's due process right to a timely hearing.

[16]     Article XIV of the Hawai'i Constitution provides that "the legislature . . . shall adopt a code of ethics which shall apply to appointed and elected officers and employees of the State or the political subdivision, respectively, including members of the boards, commissions and other bodies." Haw. Const. art. XIV.

[17]     The Commission's contention that Boyd could not have "opted out" of compliance with the code of ethics because of Article XIV of the Hawai'i Constitution is inapt.  Boyd's charges were based upon a purported violation of the code of ethics from which Boyd contends that he had been statutorily exempted.

[18]     The Commission further maintains that Boyd waived his argument that he was exempt from Chapter 84 because he did not initially raise this issue in his application for writ of certiorari.  As stated, Boyd contended both to the circuit court and the ICA that, as a charter school employee, he was statutorily exempt from the code of ethics in Chapter 84.  Additionally, both parties addressed this issue in their supplemental briefs to this court, and therefore the issue was adequately raised by Boyd to this court.

We turn first to the code of ethics, adopted by the legislature and codified in HRS Chapter 84.  The Chapter sets forth specific standards of conduct as to gifts, reporting of gifts, confidential information, fair treatment, conflicts of interests, contracts, requirements of disclosure, and post-employment restrictions.  See HRS §§ 84-11 to -18 (1993).  An ethics commission, established by Chapter 84, administers the code of ethics and enforces the provisions prescribed in the Chapter so as to promote public confidence in public servants. See HRS Chapter 84, Preamble (1993).  The conflict of interest provision at issue in this case, prescribed in HRS § 84-14, restricts a State employee from taking any official action affecting a business in which the employee has a substantial financial interest or is engaged in an official capacity. HRS § 84-14(a) (1993).[19]  It also prohibits an employee from representing or assisting a business for compensation on a contract or transaction before the agency where the employee works.  See HRS § 84-14(d) (1993).[20]

The legislature enacted HRS Chapter 302B in 2006, which governed the establishment and administration of charter

---

[19]    See supra note 5.

[20]    See supra note 6.

schools, the powers and duties of local school boards, charter schools' exemptions from State laws, and certain charter school employees' rights and benefits.  Under this comprehensive legislation, which was later repealed in 2012 and replaced with HRS Chapter 302D, charter schools were empowered with "the flexibility and independent authority to implement alternative frameworks with regard to . . . personnel management." HRS § 302B-1 (Supp. 2006 & 2007) (repealed 2012).  A local school board served as the autonomous, governing entity of the charter school with "the independent authority to determine the organization and management of the school . . . and compliance with applicable federal and state laws."  Id.

The State legislature's adoption of this comprehensive legislation relating to the governance of charter schools in HRS § 302B (Supp. 2006) (repealed 2012) indicated that charter schools were neither standard public schools nor private schools.  See HRS § 302A (Supp. 2006) (relating to public schools); HRS § 302C (Supp. 2006) (relating to private schools). Rather, charter schools, while supported in part by State general funds and linked to the Department of Education primarily for administrative purposes, had discretion and autonomy to operate independently and separately from the Department of Education and Board of Education.  See, e.g.,

HRS §§ 302B-3, -8, -12, -15, -16 (Supp. 2006 & 2007) (repealed 2012).

For example, in order to establish a charter school, a detailed implementation plan describing "[a] governance structure for the charter school that incorporate[d] a conflict of interest policy" was required to be submitted to the Board of Education. See HRS §§ 302B-5(d)(6), -6(d)(6) (Supp. 2006 & 2007) (repealed 2012). The detailed implementation plan was also required to contain a framework for assessing the accountability of faculty and staff, both individually and collectively, that was "at least equivalent to the average system of accountability" in State public schools. HRS §§ 302B-5(d)(1), -5(d)(5), -6(d)(1), -6(d)(5). A necessary component of the implementation plan was to provide for program audits and annual financial audits. HRS §§ 302B-5(d)(5)(A), -5(d)(5)(D), -6(d)(5)(A), -6(d)(5)(D). This detailed implementation plan served as the basis for a "performance contract" between the Board of Education and the charter school and presented a plan for holding the charter school accountable for its operations, finances, and management. See HRS § 302B-1.[21] Thus, under

---

[21]    A "detailed implementation plan" was defined as "the document that details the charter school's purpose, focus, operations, organization, finances, and accountability, and becomes the basis for a performance contract between the board and the charter school." HRS § 302B-1.

HRS §§ 302B-5(d) and 302B-6(d), charter schools and their local school boards were required to establish a framework of accountability that incorporated a conflict of interest policy and provided for annual financial audits.

Once established as a charter school under Chapter 302B, a charter school was mandated to conduct a comprehensive self-evaluation that was submitted to the charter school review panel at the end of the school year. HRS § 302B-14(a) (Supp. 2006 & 2007) (repealed 2012).[22] The self-evaluation process required an evaluation of the school's organizational viability, which necessitated a showing that the charter school operates in "accordance with office guidelines and procedures, is financially sound and fiscally responsible in its use of public funds, maintains accurate and comprehensive financial records, operates in accordance with generally accepted accounting practices, and maintains a sound financial plan." HRS § 302B-1.

The autonomy and independence accorded to charter schools was further reflected in HRS § 302B-9(a), which specifically exempted charter schools from Chapter 91 and

---

[22] HRS § 302B-14(a) provides, in relevant part, that "[e]very charter school shall conduct annual self-evaluations that shall be submitted to the board within sixty working days after the completion of the school year. The self-evaluation process shall include but not be limited to: . . . (6) [a]n evaluation of the school's organizational viability."

Chapter 92, pertaining to the procedures of State agencies.  See HRS § 302B-9(a).  HRS § 302B-9(b) also provided that charter schools were exempt from the procurement code in HRS Chapter 103D but were mandated to develop their own internal policies and procedures "consistent with the goals of public accountability and public procurement practices."  HRS § 302B-9(b).  In addition to these exemptions from specific HRS chapters, charter schools were exempt from all other State laws in conflict with Chapter 302B.  HRS § 302B-9(a).

Thus, HRS Chapter 302B set forth a statutory scheme that empowered a charter school to delineate and implement a framework of accountability that established internal conflict of interest policies and procedures.  In developing and enforcing this framework of accountability, the applicable statutory provisions permitted a charter school to hire its own auditors to review the school's policies and procedures and to recommend improvements to personnel management and the use of fiscal resources.  With mandated yearly self-evaluations required by Chapter 302B, a charter school was responsible for assessing its administrative operations and financial accountability.  Thus, the legislature enacted a statutory scheme in which charter schools were accorded discretion, autonomy, and independence over matters relating to the required

establishment of standards of conduct for charter school employees. These standards of conduct included conflict of interest standards.

Generally, a state law conflicts with another state law where the statutory provisions are "explicitly contrary to, or inconsistent with," each other. See In re Haw. Gov't Emps. Ass'n, 116 Hawai'i 73, 102-03, 170 P.3d 324, 353-54 (2007). Here, HRS § 84-14 prescribed standards of conduct as to conflicts of interests that employees were required to adhere to, whereas HRS §§ 302B-5(d)(6) and 302B-6(d)(6) required charter schools to submit a detailed implementation plan containing a conflict of interest policy and assessment plan providing for faculty and staff accountability and annual financial audits. HRS § 302B-14(a) further mandated that charter schools conduct yearly self-evaluations in order to ensure compliance with State and federal laws. Charter schools were thus obligated to develop, implement, and revise their own internal and independent conflict of interest policies and procedures for charter school employees.

During the relevant time period, HRS Chapter 302B, which was adopted in 2006 and later repealed in 2012, did not require charter schools to adopt the specific standards of conduct prescribed in HRS § 84-14. That is, the internal

policies and procedures relating to conflicts of interests that charter schools established and implemented could have been identical, more expansive, or less restrictive than the conflict of interest provision prescribed in HRS § 84-14. Additionally, Chapter 302B required charter schools to review their policies and procedures with respect to responsibility for the use of public funds, which would include conflict of interest standards per the requirements of the school's detailed implementation plan. Further, during the relevant time period, Chapter 302B did not require that the internal policies and procedures of charter schools relating to conflicts of interests be consistent with the code of ethics.[23]

In contrast, HRS § 84-14 required that an individual employee conform to specific statutory conflict of interest standards. Concurrently, Chapter 302B provided that charter schools develop and establish conflict of interest standards to govern charter school employees. If both HRS § 84-14 and

---

[23] Under the current statutory scheme governing charter schools, charter school employees are expressly subject to the code of ethics and not exempt from HRS § 84-14. In 2011, the legislature amended HRS Chapter 302B to provide that "[c]harter schools and their local school boards shall develop internal policies and procedures consistent with ethical standards of conduct, pursuant to chapter 84." HRS § 302B-7(f) (Supp. 2011) (repealed 2012). In 2012, the legislature repealed HRS Chapter 302B and enacted Chapter 302D. Under HRS § 302D-12(i), "[a]ll charter school employees and members of governing boards shall be subject to chapter 84." HRS § 302D-12(i) (Supp. 2012).

Chapter 302B applied to a charter school employee during the relevant time period, then that employee would have been subject to two separate conflict of interest standards. Thus, that same employee could have been subject to punishment under one set of standards, but not the other, for the same conduct.[24]

Consequently, HRS § 84-14 was inconsistent with the provisions of HRS §§ 302B-5(d)(6) and 302B-6(d)(6) as to conflict of interest standards. Because HRS § 84-14 conflicted with these subsections of Chapter 302B at the time of the alleged violations, Boyd was exempt from HRS § 84-14, pursuant

_____

[24] Although unnecessary to our holding, the circumstances in this case reflect the inconsistency resulting from the application of the relevant statutory provisions. In 2006 and 2007, Connections, in accordance with the requirements of its Detailed Implementation Plan, developed and implemented conflict of interest policy and procedures, and it evaluated on a yearly basis whether the school was financially sound and fiscally responsible in its use of public funds. See HRS §§ 302B-1, -5(d)(6), -6(d)(6), -7(c), -14(a). Connections' administrative framework required documentation and multiple levels of review by school officials for transactions involving the use of school funds. These policies and procedures indicate that Connections established an organizational structure designed to avoid financial mismanagement, provide transparency, and maximize the effective use of school funds.

Boyd followed Connections' conflict of interest policy by including the requisite information on the purchase order forms and Food Service Certificates and by ensuring the proper documentation was submitted to the appropriate school officials. All approvals were obtained prior to purchasing the requested materials, which included reviewing whether the school materials and lunches were obtained at the lowest possible price. Yet, despite acting in accordance with Connections' internal conflict of interest policy and procedures, Boyd was charged and found in violation of twenty counts of HRS § 84-14, the conflict of interest provision contained in the code of ethics. He was fined $500 for each violation, totaling a fine of $10,000. Boyd was thus subject to punishment under HRS § 84-14 for the same conduct that was in compliance with Connections' conflict of interest policy, which was adopted in accordance with HRS §§ 302B-5(d)(6) or 302B-6(d)(6).

to HRS § 302-9(a).  Thus, we conclude that the Commission lacked authority to adjudicate proceedings against Boyd for alleged violations of HRS § 84-14 that occurred in 2006 and 2007. Accordingly, the circuit court erred in its partial affirmance of the Commission's Decision and Order, and the ICA erred in affirming in part and reversing in part the circuit court's Order and remanding the case to the circuit court to enter final judgment affirming the Commission's Decision and Order.

## IV.    CONCLUSION

For the reasons discussed, we vacate the ICA's Judgment on Appeal, the circuit court's Order and Final Judgment, and the Commission's Decision and Order, and we remand the case to the Commission with instructions to dismiss the case.[25]

Ted H. S. Hong
for petitioner

Kimberly Tsumoto Guidry
For respondent

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

/s/ Gary W.B. Chang



---

[25]    Boyd also raised the question of whether charter school employees are employees of the State.  In light of our disposition, it is unnecessary to resolve this question, and, accordingly, the ICA ruling as to this issue is also vacated.  Additionally, we do not reach other issues raised by Boyd.