**Electronically Filed
Supreme Court
SCRQ-22-0000118
15-MAR-2023
10:32 AM
Dkt. 52 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

FLORES-CASE ʻOHANA,
Plaintiff-Appellant,

vs.

UNIVERSITY OF HAWAIʻI,
Defendant-Appellee.

SCRQ-22-0000118

RESERVED QUESTION FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 3CCV-20-0000255)

MARCH 15, 2023

RECKTENWALD, C.J., AND WILSON, J., WITH McKENNA, J.,
CONCURRING IN PART AND DISSENTING IN PART[1]

OPINION BY RECKTENWALD, C.J.

## I.   INTRODUCTION

In this case, a Native Hawaiian family challenges the

---

[1]    Chief Justice Recktenwald, joined by Justices McKenna and Wilson, writes for a majority of the court in Parts II, III, IV(A), IV(B), and IV(D). Justice McKenna does not join Chief Justice Recktenwald as to Parts I and IV(C).

constitutionality of administrative rules governing access to Mauna Kea's summit under article XII, section 7 of the Hawai'i Constitution. The Circuit Court of the Third Circuit reserved the following questions to us pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 15 (2018), which we accepted:

> In a challenge to the constitutionality of administrative rules based on a violation of Article XII, Section 7 of the Hawai'i State Constitution, does the burden of proof shift to the government defendant to prove that the rules are reasonable and do not unduly limit the constitutional rights conferred in Article XII, Section 7? If so, what standards govern its application?

In answering reserved questions, we apply the same principles we utilize in answering certified questions from federal courts. Specifically, "[t]his court may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 138 Hawai'i 14, 16, 375 P.3d 1252, 1254 (2016) (quotation marks omitted) (quoting Allstate Ins. Co. v. Alamo Rent-A-Car, Inc., 137 F.3d 634, 637 (9th Cir. 1998)). We see no reason why the framework applied to certified questions from federal courts would not apply to reserved questions from "circuit court, the land court, the tax appeal court [or] any other court empowered by statute." See HRAP Rule 15(a).

Accordingly, we "reformulate the question so that a negative answer to the first [reserved] question will not

2

preclude us from answering the second [reserved] question." See Pac. Radiation Oncology, LLC, 138 Hawai'i at 16, 375 P.3d at 1254. We also "reformulate the question" to remove any confusion about what standard applies to constitutional challenges arising from article XII, section 7. See id. As we explain, the standard does not require, as the circuit court's reserved questions imply, that plaintiffs must "prove that the rules are [un]reasonable and [] unduly limit the constitutional rights conferred in Article XII, Section 7."

Therefore, the reformulated reserved questions are as follows: (1) In a challenge to the constitutionality of administrative rules based on a violation of article XII, section 7 of the Hawai'i Constitution, does the burden of proof shift to the government defendant? (2) What standard governs a challenge to the constitutionality of an administrative rule based on an alleged violation of article XII, section 7?

First, in Part IV(A), we hold that the burden does not shift to the government agency, and instead remains with the challenging party, in constitutional challenges to administrative rules arising from article XII, section 7. In general, the party challenging the constitutionality of an administrative rule bears the burden of proof. This longstanding general rule governs absent an exception, which we do not make today.

3

Second, in Part IV(B), we determine that the Ka Pa'akai framework applies to rulemaking in addition to contested case hearings. See Ka Pa'akai O Ka'Aina v. Land Use Comm'n, 94 Hawai'i 31, 7 P.3d 1068 (2000), as amended (Jan. 18, 2001). There is no principled basis to exempt agency rulemaking from the State's constitutional obligations under article XII, section 7. In Ka Pa'akai, we recognized that article XII, section 7 of the Hawai'i Constitution "places an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights" during contested case hearings. Id. at 45, 7 P.3d at 1082 (emphasis added). That "affirmative duty" applies during rulemaking as well. See id.

Third, in Part IV(C) and consistent with the Ka Pa'akai framework, we hold that agencies must engage in a contemporaneous analysis of the relevant factors prior to adopting a rule. That analysis should identify Native Hawaiian traditional and customary rights or practices affected by the proposed rule, if any, consider the scope and extent to which those rights or practices will be impaired, and explain how the proposed rule reasonably protects those rights and practices as balanced with the State's own regulatory right.

Fourth, in part IV(D), we hold that to succeed in an article XII, section 7 constitutional challenge to

4

administrative rules, a plaintiff must show: (1) the agency failed to adequately consider "the identity and scope of" Native Hawaiian traditional and customary rights affected by the rule, if any; or (2) the agency failed to adequately consider "the extent to which" Native Hawaiian traditional and customary rights "will be affected or impaired by the [rule]"; or (3) the rule failed to "reasonably protect" Native Hawaiian traditional and customary rights, "if they are found to exist," as balanced with the State's own regulatory right.  See id. at 47, 7 P.3d at 1084 (emphasis added).  The test sets forth both the steps agencies must take prior to promulgating rules and the standard by which rules will be judged under article XII, section 7.  This test necessarily requires agencies to consider a rule's impact on Native Hawaiian traditional and customary rights so that a court may determine whether that analysis and the rule passes constitutional muster.

As we explained in Ka Pa'akai, "[r]equiring these minimal prerequisites facilitates precisely what the 1978 Constitutional Convention delegates sought: 'badly needed judicial guidance' and the 'enforcement by the courts of these rights[.]'"  Id. at 50, 7 P.3d at 1087 (quoting Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640 (1980)).  We apply the Ka Pa'akai framework and its requirement of contemporaneous consideration

of Native Hawaiian rights to administrative rulemaking because, if not, an agency's "promise of preserving and protecting customary and traditional rights would be illusory absent [consideration of] the extent of their exercise, their impairment, and the feasibility of their protection." Id. Put simply, today we hold the State and its agencies to the promise made in 1978: "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights." Haw. Const. art. XII, § 7 (emphasis added).

## II. BACKGROUND

In 2009, the legislature passed Act 132,[2] which empowered the University of Hawai'i (UH) to promulgate administrative rules governing access to the summit of Mauna Kea.[3] 2009 Haw. Sess. Laws Act 132, § 1 at 362-65. Act 132

---

[2] Act 132 is codified at Hawai'i Revised Statutes (HRS) §§ 304A-1901 to -1905 (2020).

[3] Specifically, Act 132 granted UH rulemaking authority over "Mauna Kea lands" – that is:

> the lands that [UH] is leasing from the board of land and natural resources, including the Mauna Kea Science Reserve, Hale Pōhaku, the connecting roadway corridor
>
> (continued . . .)

sought to "clarify and add certainty to the law relating to" UH's stewardship of Mauna Kea "by granting express authority to [UH] to adopt rules relating to public and commercial activities permitted or occurring on the Mauna Kea lands."  Id. at 362. The law provided that "[a]ccess for traditional and customary native Hawaiian cultural and religious purposes shall be accommodated."  Id.

UH did not formally draft administrative rules governing access to the summit of Mauna Kea until 2018.  That August, UH circulated a notice of proposed rulemaking and, in September, held public hearings on Oʻahu, Maui, and the Island of Hawaiʻi.  After receiving comments, UH circulated a new draft of the rules for comment.[4]  A second round of public hearings took place in April 2019.[5]  The final administrative rules were adopted by a unanimous vote of the UH Board of Regents on November 6, 2019.  And on January 13, 2020, Governor David Ige signed the administrative rules into law.  See Hawaiʻi Administrative Rules (HAR) § 20-26, et seq. (2020) (hereinafter

---

(. . . continued)
between Hale Pōhaku and the Mauna Kea Science Reserve, and any other lands on Mauna Kea that [UH] leases or over which the University of Hawaiʻi acquires control or jurisdiction.

[4]     According to UH, the rules received 406 written submissions during the comment period (August 19 to September 28) and ninety-two oral comments.

[5]     During this round of comments (April 28 to June 7), UH received 332 written submissions and 133 oral comments.

"Chapter 20-26").

On June 29, 2020, Plaintiff-Appellant Flores-Case 'Ohana (FCO)[6] filed a complaint for declaratory and injunctive relief against UH in the Circuit Court of the Third Circuit, seeking invalidation of the rules.[7]  The circuit court certified to us the following reserved questions:

> In a challenge to the constitutionality of administrative rules based on a violation of Article XII, Section 7 of the Hawai'i State Constitution, does the burden of proof shift to the government defendant to prove that the rules are reasonable and do not unduly limit the constitutional rights conferred in Article XII, Section 7? If so, what standards govern its application?

As noted above, we reformulated the reserved questions as follows: (1) In a challenge to the constitutionality of administrative rules based on a violation of article XII, section 7 of the Hawai'i Constitution, does the burden of proof shift to the government defendant?  (2) What standard governs a challenge to the constitutionality of an administrative rule based on an alleged violation of article XII, section 7?

### III. STANDARD OF REVIEW

---

[6]     The complaint identified FCO as:

> an unincorporated association of a Kanaka Maoli (also identified as a Native Hawaiian) family who descends from the aboriginal people who occupied and exercised sovereignty in the area that is now occupied by the State of Hawai'i prior to 1778, resides on Hawai'i Island, and engages in traditional and cultural practices throughout Mauna Kea, including on lands managed by the University of Hawai'i.

[7]     The Honorable Robert D.S. Kim presided.

A reserved question that presents a question of law is "reviewable de novo under the right/wrong standard of review." State v. Jess, 117 Hawai'i 381, 391, 184 P.3d 133, 143 (2008) (quoting Roes v. FHP, Inc., 91 Hawai'i 470, 473, 985 P.2d 661, 664 (1999)). "On a reserved question we are required to answer a question of law based on facts reported to this court by the circuit judge. We may not express an opinion on a question of law by assuming certain facts as to which the circuit judge has made no finding." Cabrinha v. Am. Factors, Ltd., 42 Haw. 96, 100 (Haw. Terr. 1957).

## IV. DISCUSSION

### A. The Burden of Proof Does Not Shift to the Government Defendant in Constitutional Challenges Arising from Article XII, Section 7 of the Hawai'i Constitution

The "general rule [is] that one seeking relief bears the burden of demonstrating that [they are] entitled to it." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984) (declining to deviate from the general rule in a First Amendment constitutional challenge). We decline to deviate from the general rule here.[8] We therefore hold that the burden of proof rests with the challenging party, not the government

---

[8] We note however that the burden of proof does shift to the government defendant in certain types of constitutional challenges. For example, in Nagle v. Bd. of Educ., we held that strict scrutiny applies to challenges that involve suspect classifications or fundamental rights. 63 Haw. 389, 392, 629 P.2d 109, 111 (1981). "Under the strict scrutiny standard, the State carries a heavy burden in arguing for the validity of a statute." Id. (emphasis added).

defendant, when challenging the constitutionality of an administrative rule under article XII, section 7.  See Westlawn Cemeteries, L.L.C. v. La. Cemetery Bd., 339 So. 3d 548, 560 (La. 2022) ("[It is] proper to place the burden of proving unconstitutionality on the party challenging the administrative rule, as is clearly the case with statutes or ordinances.").  We agree with the Louisiana Supreme Court that "[p]lacing the burden of proof on the party challenging a rule is consistent with other situations whereby the moving party has the burden of proof (e.g., summary judgment motions and exceptions)."[9]  Id.

---

[9]     In Westlawn, the Louisiana Supreme Court examined the principles governing constitutional challenges to statutes and administrative rules. 339 So. 3d at 552-62.  The court explained that "[a]ll statutory enactments are presumed constitutional" and that "[t]his presumption is based on the premise that legislators are presumed to have weighed the relevant constitutional considerations in enacting legislation."  Id. at 559 (emphasis added) (quotation marks omitted).  Administrative rules "on the other hand, [are] not one enacted by a legislative body," and accordingly, the Louisiana Supreme Court declined to "apply a presumption of constitutionality to an administrative rule."  Id.

Westlawn is consistent with our own case law.  We have previously explained that in constitutional challenges to statutes, there is a "presumption that every enactment of the Legislature was adopted in accordance with the Constitution."  League of Women Voters of Honolulu v. State, 150 Hawai'i 182, 194, 499 P.3d 382, 394 (2021), as corrected (Nov. 4, 2021).  But we have never extended that presumption to administrative rules. We agree with the Westlawn court that "[u]nlike an elected legislature, an administrative agency is not presumed to have weighed principles of constitutionality in promulgating its rules and regulations."  339 So. 3d at 560.  Accordingly, we decline to extend a presumption of constitutionality as to administrative rules.

We do not, however, agree with or adopt Westlawn's formulation of the standard of review for facial challenges: "To establish that a statute, or as here, an administrative rule, is facially unconstitutional, the party challenging it 'must establish that no set of circumstances exists under which [it] would be valid, that is, that the law is unconstitutional in all its applications.'"  Id. at 561 (footnote omitted) (alteration in original). As we explain infra, the relevant constitutional test is not Salerno's "no set of circumstances" test.

10

Westlawn is also consistent with our own precedents. For example, in our previous cases addressing the burden of proof in constitutional challenges arising from article XII, section 7 in the criminal context, we held that the burden rests on the challenging party in the criminal context. In State v. Hanapi, we determined that the initial burden of proof rests with the defendant claiming a privilege based on article XII, section 7. 89 Hawai'i 177, 184, 970 P.2d 485, 492 (1998) ("[I]t is the obligation of the person claiming the exercise of a native Hawaiian right to demonstrate that the right is protected."). We see no reason to shift the burden in challenges to administrative rules in the civil context.

## B. The State's Affirmative Duty to Protect Native Hawaiian Rights Applies to Administrative Rulemaking in Addition to Contested Case Hearings

We next examine whether the Ka Pa'akai framework should be applied outside of the contested case hearing context. FCO contends that "an agency's duty to identify traditional [and] customary practices, determine how those interests will be affected by a proposed rule, and to take feasible action to reasonably protect them, applies not only when it sits in a quasi-judicial capacity; it bears the same obligations when it acts to adopt rules." We agree. Our decisions have made clear

that Native Hawaiian[10] traditional and customary rights and practices have broad-ranging protections under article XII, section 7.  These protections are flexible and must be adapted to the particular context or situation where they are implicated, whether during administrative adjudications, like contested case hearings, or administrative rulemaking, like the promulgation of Chapter 20-26.

We hold that the Ka Pa'akai framework for contested case hearings applies to administrative rulemaking.  We reiterate that agencies "may not act without independently considering the effect of their actions on Hawaiian traditions and practices."  94 Hawai'i at 46, 7 P.3d at 1083 (emphasis added).  When agencies act prospectively, by promulgating rules, instead of retrospectively, by adjudicating individual rights or claims in contested case hearings, they are no less obligated to abide by their duties under article XII, section 7.  There is no principled basis to exempt agency rulemaking from the State's constitutional obligations.

Administrative rules are potentially far-reaching statements of policy with the force and effect of law.  See HRS § 91-1(4) (Supp. 2021) (defining a rule in relevant part as an

_____

[10]     Where quoted language in this opinion uses "native Hawaiian" or "Hawaiian," we clarify those references to encompass all Native Hawaiians, which refers to descendants of the indigenous peoples who inhabited the Hawaiian Islands prior to 1778, regardless of blood quantum.

"agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy"). Rules are no less significant, nor less susceptible to constitutional challenges, than are specific agency actions like contested case hearings. See HRS § 91-7 (Supp. 2021) (providing that "[a]ny interested person" may seek to invalidate a rule, inter alia, based on conflict with a constitutional provision).

Our cases analyzing article XII, section 7 emphasize two competing principles: first, that the State is "obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians;" and second, that the State is "authorized to impose appropriate regulations to govern the exercise of native Hawaiian rights." See Pub. Access Shoreline Haw. v. Haw. Cnty. Plan. Comm'n (PASH), 79 Hawai'i 425, 450-51, 450 n.43, 903 P.2d 1246, 1271-72, 1271 n.43 (1995). Thus, while agencies have the power to regulate "traditionally exercised rights of Hawaiians" in contested case hearings or through administrative rulemaking, that regulatory power is constrained by the State's obligation to protect those rights when exercising that power. Id. at 450 n.43, 903 P.2d at 1271 n.43.

In PASH we made clear that the State's authority to regulate Native Hawaiian rights, although substantial, is not unfettered. In that case, the plaintiffs challenged the Hawai'i

County Planning Commission's (HPC) decision to grant a development permit for a resort on the Kona coast while denying Native Hawaiian practitioners' request for a contested case hearing. Id. at 429-30, 903 P.2d at 1250-51. We reiterated that "the State retains the ability to reconcile competing interests under article XII, section 7" and that the provision "accords an ample legal basis for regulatory efforts by the State." Id. at 447, 451, 903 P.2d at 1268, 1272. This authority "necessarily allows the State to permit development that interferes with . . . [traditional and customary] rights in certain circumstances," for example, where the "protection of such rights would result in 'actual harm.'" Id. at 450 n.43, 903 P.3d at 1271 n.43 (quoting Kalipi v. Hawaiian Tr. Co., 66 Haw. 1, 12, 656 P.2d 745, 752 (1982)).

However, we also held that "the State does not have the unfettered discretion to regulate the rights of ahupua'a tenants out of existence." Id. at 451, 903 P.2d at 1272. This is because "legitimate customary and traditional practices must be protected to the extent feasible in accordance with article XII, section 7." Id. (emphasis added). Thus, we held that, "to the extent feasible, . . . HPC must protect the reasonable exercise of customary or traditional rights that are established by PASH on remand." Id.

Following up on PASH, we recognized in Ka Pa'akai that

14

in contested case hearings, the State and its agencies have an "affirmative duty . . . to preserve and protect traditional and customary native Hawaiian rights" and provided a framework "to effectuate the State's obligation to protect native Hawaiian customary and traditional practices while reasonably accommodating competing private interests."  94 Hawai'i at 45-47, 7 P.3d at 1082-84.  There, community groups challenged the Land Use Commission's (LUC) decision to grant a developer's petition to reclassify over 1,000 acres from conservation to urban use. Id. at 34, 7 P.3d at 1071.

We held that in order to fulfill its "affirmative duty," the LUC was required to "at a minimum — make specific findings" regarding (1) "the identity and scope of" traditional resources and customary rights in the impacted area; (2) the extent to which those rights and resources would be "affected or impaired by the proposed action;" and (3) "the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist."  Id. at 45, 47, 7 P.3d at 1082, 1084 (emphasis in original).  We concluded that the LUC's findings were "insufficient to determine whether it discharged its duty to protect customary and traditional

practices of native Hawaiians to the extent feasible."[11]  Id. at 48, 7. P.3d at 1085.  In sum, these cases establish that the State bears an "affirmative duty" to protect the reasonable exercise of Native Hawaiian traditional and customary practices, but this duty is qualified by the State's right to accommodate competing interests.  See id. at 45, 7 P.3d at 1082.

None of our cases suggest that agencies are bound by these protections only in contested case hearings.  To the contrary, article XII, section 7 protects "the broadest possible spectrum of native rights" and was not intended to be narrowly construed.  Pele Def. Fund v. Paty, 73 Haw. 578, 619-20, 837 P.2d 1247, 1271 (1992) (quoting Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 640 (1980)).  And, as we explained in Ka Paʻakai in the contested case hearing context, "[r]equiring these minimal prerequisites facilitates precisely what the 1978 Constitutional Convention delegates sought: 'badly needed judicial guidance' and the 'enforcement by the courts of these rights[.]'"  94 Hawaiʻi at 50, 7 P.3d at 1087 (quoting Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of

---

[11]     We also held that the reclassification's condition that the developer protect the gathering and access rights of Native Hawaiian practitioners granted it "unfettered authority to decide which native Hawaiian practices are at issue and how they are to be preserved or protected," and thus invalidly delegated the LUC's obligation to protect those practices to a private party.  Id. at 51, 7 P.3d at 1088.

16

1978, at 640 (1980)).  That same reasoning applies to administrative rulemaking because, if not, an agency's "promise of preserving and protecting customary and traditional rights would be illusory absent [consideration of] the extent of their exercise, their impairment, and the feasibility of their protection."  Id.

Applying the Ka Pa'akai framework to rulemaking is consistent with the intent of the framers of article XII, section 7.  That provision "grew out of a desire to 'preserve the small remaining vestiges of a quickly disappearing culture [by providing] a legal means by constitutional amendment to recognize and reaffirm native Hawaiian rights.'"  Id. at 45, 7 P.2d at 1082 (alteration in original) (quoting Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640 (1980)).  The framers recognized that "[s]ustenance, religious and cultural practices of native Hawaiians are an integral part of their culture, tradition and heritage, with such practices forming the basis of Hawaiian identity and value systems," id. (quoting Comm. Whole. Rep. No. 12, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1016 (1980)), and accordingly "did not intend to have the section narrowly construed."  Pele Def. Fund, 73 Haw. at 620, 837 P.2d at 1271 (quoting Stand. Comm. Rep. No. 57, in 1

17

Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640 (1980) (emphasis in orginal)). Native Hawaiian traditional and customary rights do not exist at the sufferance of the State and its agencies.

In sum, the Ka Pa'akai framework applies to administrative rulemaking in addition to contested case hearings. Requiring the State and its agencies to consider Native Hawaiian traditional and customary rights in these contexts "effectuate[s] the State's obligation to protect native Hawaiian customary and traditional practices[.]" Ka Pa'akai, 94 Hawai'i at 47, 7 P.3d at 1084.

## C. Agencies Must Engage in a Contemporaneous Ka Pa'akai Analysis When Promulgating Administrative Rules

Having determined that the Ka Pa'akai framework applies to administrative rulemaking, we now elaborate on what is required of an agency under that framework when promulgating administrative rules. In Ka Pa'akai, we explained that "[i]n order for native Hawaiian rights to be enforceable, an appropriate analytical framework for enforcement is needed" for contested case hearings. Id. at 46, 7 P.3d at 1083. We now set forth the "appropriate analytical framework" for administrative rulemaking so that "native Hawaiian rights [are] enforceable." See id.

In its amicus brief, the Attorney General (AG) argues

18

that while "[r]equiring findings of fact regarding the assessment of traditional and customary rights may work in the contested-case setting, [] it does not in the rule-making setting."  According to the AG, "[t]he resolution of the Ka Pa'akai analysis and the making of factual findings depends on record evidence," whereas rulemaking produces no evidentiary record.  The AG asserts that it is "fundamentally unreasonable" to apply Ka Pa'akai "where there is no evidentiary record and nobody's rights, duties, or privileges are judicially determined."  The AG's argument fails because it does not acknowledge that the requirements of Ka Pa'akai can be adapted to the rulemaking context.

Just because Ka Pa'akai may not apply in the same way to rulemaking as it does to contested case hearings does not mean that its principles do not apply.  To the contrary, Ka Pa'akai spoke about agency action in broad terms.  94 Hawai'i at 46, 7 P.3d at 1083.  And its framework can and should be broadly applied to rulemaking; the State has an "affirmative duty . . . to preserve and protect traditional and customary native Hawaiian rights," and doing so requires identifying the scope and extent of impacted rights and the feasible steps taken to protect them.  Id. at 45, 47, 7 P.3d at 1082, 1084.

At its core, Ka Pa'akai concluded the State's

constitutional duty means that its agencies "may not act without independently considering the effect of their actions on Hawaiian traditions and practices."  Id. at 46, 7 P.3d 1083 (emphasis added).  This procedural requirement, that agency action must be preceded by consideration of Native Hawaiian traditional and customary rights, should apply equally when agencies act in a quasi-judicial manner (contested case hearings) and in a quasi-legislative manner (administrative rulemaking).  State agencies perform different functions and roles when exercising their quasi-judicial and quasi-legislative powers and as such, the process by which agencies demonstrate they have met their affirmative duty under the constitution may necessarily differ depending on which power is exercised.  See Green Party of Haw. v. Nago, 138 Hawai'i 228, 238, 378 P.3d 944, 954 (2016) ("This court has recognized that rule-making is essentially legislative in nature because it operates in the future; whereas, adjudication is concerned with the determination of past and present rights and liabilities of individuals where issues of fact often are sharply controverted."  (internal quotation marks omitted)).

In contested case hearings, where agencies wear a quasi-judicial hat, Ka Pa'akai requires that agencies "at a minimum" issue "specific findings and conclusions" on:

> (1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.

94 Hawai'i at 47, 7 P.3d at 1084 (footnote omitted) (emphasis in original).

In a contested case hearing appeal, the State agency acts like a court. It makes sense then to require the agency, acting in a quasi-court capacity, to issue findings of fact and conclusions of law similar to the manner in which courts issue findings of fact and conclusions of law.[12] This permits courts to review the agency's decisions to determine if the agency, prior to acting, properly "consider[ed] the effect of their actions on Hawaiian traditions and practices" as required by article XII, section 7. Id. at 46, 7 P.3d at 1083 (emphasis added).

When rulemaking, an agency does not sit as a quasi-judicial body whose work must be reviewed. The agency need not issue findings of fact or conclusions of law as in contested case hearings because it does not sit as a quasi-court.

---

[12] Indeed, the Hawai'i Administrative Procedures Act requires that "[e]very decision and order . . . rendered by an agency in a contested case . . . be in writing or stated in the record and . . . be accompanied by separate findings of fact and conclusions of law." HRS § 91-12.

Different roles require different methods of review to hold the State accountable to its constitutional duties.

Therefore, applying the Ka Pa'akai framework to rulemaking, we hold that before adopting rules, agencies must consider: (1) "the identity and scope of" Native Hawaiian traditional and customary rights affected by the rule, if any;[13] (2) "the extent to which" Native Hawaiian traditional and customary rights "will be affected or impaired by the [rule]"; and (3) whether the proposed rules "reasonably protect" Native Hawaiian traditional and customary rights, "if they are found to exist," as balanced with the State's own regulatory right. See id. at 47, 7 P.3d at 1084 (emphasis added).

Although formal findings of fact and conclusions of law are not required, agencies must prepare a written statement summarizing the above analysis prior to adopting a proposed rule, and make that analysis available to the public. When

---

[13] If an agency determines that a proposed rule will not impact any Native Hawaiian traditional and customary practices, the analysis ends there and the agency will have met its constitutional obligations. Compare In re Conservation Dist. Use Application HA-3568, 143 Hawai'i 379, 396-98, 431 P.3d 752, 769-71 (2018) (holding the agency complied with Ka Pa'akai because it identified no Native Hawaiian cultural resources or traditional or customary practices within the project area and found that no traditional and customary rights would be affected or impaired by the proposed action) with In re 'Iao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications, 128 Hawai'i 228, 248, 287 P.3d 129, 149 (2012) (finding the agency failed to properly apply the Ka Pa'akai framework because although it identified and documented the project area's Native Hawaiian practices, the agency did not demonstrate the effect of the project on the identified Native Hawaiian practices or make any findings about the feasibility of protecting the identified practices).

undertaking this analysis, the agency is not required to "negative any and all native Hawaiian rights claims regardless of how implausible the claimed right may be."[14]  Hanapi, 89 Hawai'i at 184, 970 P.2d at 492.  Where no Native Hawaiian right or practice is identified or implicated, the agency may say so in a short statement and the need for analysis ends there.

Requiring a contemporaneous, written analysis will not unduly burden agencies.  Agencies are already required to provide reasoned justifications for the decisions they made during the rulemaking process.  The procedures agencies must follow when adopting, amending, and repealing administrative rules are set forth in HRS § 91-3.  The agency must first "[g]ive at least thirty days' notice for a public hearing."  HRS § 91-3(1).  That notice must clearly indicate the topic of the proposed rule or amendment, must offer to mail a copy of the

_____

[14]    In cases where there is no readily apparent impacted Native Hawaiian traditional or customary right or practice, we suggest making the analysis public when the agency notices a public hearing under HRS § 91-3(1). The agency can provide a simple statement with its notice saying it identified no impacted rights or practices.  Interested parties can then review the agency's analysis and bring forth any rights or practices the agency failed to identify during a public hearing or through written and oral submissions.  See HRS § 91-3(2).  The agency, if it receives any comments raising impacted rights or traditions, can then engage in the analysis outlined above and issue a revised analysis reflecting public input prior to promulgating a rule.

In cases, such as this one, where Native Hawaiian traditional and customary rights and practices are plainly implicated, the agency can wait to issue its analysis until after the notice-and-comment period so it can appropriately conduct the required analysis.  We require only that prior to, or contemporaneously with, adopting administrative rules, agencies engage in and make public the required analysis.  Agencies have discretion to determine when during the rulemaking process to make public the required analysis, but the context of the rulemaking should guide that decision.

rule or amendment to interested parties, must indicate where and when a copy is available for review, and must give the time and place of the public hearing.  HRS §§ 91-3(1)(A)-(D).  The agency must afford any interested party an opportunity to submit "data, views, or arguments" and shall "fully consider all written and oral submissions."  HRS § 91-3(2); see also Aguiar v. Haw. Hous. Auth., 55 Haw. 478, 487–88, 522 P.2d 1255, 1262 (1974) ("[A]n agency must consider the views of interested persons where it seeks to promulgate a rule, no matter how complex is the data that goes into the rule's formulation." (internal quotations omitted)).  Upon taking its final action, the agency must "issue a concise statement of the principal reasons for and against its determination" to any interested party.  HRS § 91-3(2).  The agency's final decision is then subject to approval by the governor, who can require a statement of the agency's reasons for adopting the rule.  HRS § 91-3(2).

In sum, it would not unduly burden an agency promulgating a rule that potentially impacts Native Hawaiian customary and traditional rights or practices to engage in this analysis because agencies must already be prepared to provide justifications for their proposed rules.[15]  Our holding today

---

[15]     We note that under the Administrative Procedure Act, federal agencies are required to provide reasoned justifications when rulemaking.
(continued . . .)

24

only requires agencies to show that they met their obligations under the constitution so that the public can evaluate an agency's decision, and courts have a basis to review that decision if subsequently challenged in court.[16]

After the agency has prepared and made public a written statement of the analysis described above and the rule has been adopted, plaintiffs may challenge the constitutionality of the rule under article XII, section 7. As we explain, the burden then rests on the plaintiff to show that agency did not adequately consider or reasonably protect Native Hawaiian traditional and customary rights or practices as balanced with the State's own right to regulate.

---

(. . . continued)
See, e.g., SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (holding that agencies must provide a clear basis for their determinations in order for those determinations to withstand judicial review); Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. 29, 42-43 (1983) (invalidating an agency's decision to rescind a rule because it failed to provide a "reasoned analysis" for changing its course); FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (holding an agency must provide a reasoned explanation for departing from a prior policy and show that there are "good reasons" for the new policy, though these reasons need not be "better than the reasons for the old one").

[16] Our holding here does not apply to the legislature or to constitutional challenges to statutes enacted by the legislature. We hold administrative agencies to different standards because "[u]nlike an elected legislature, an administrative agency is not presumed to have weighed principles of constitutionality in promulgating its rules and regulations." Westlawn, 339 So. 3d at 560. While agencies may act as quasi-legislative bodies, they are not directly responsible to voters. Cf. Citizens Ass'n of Georgetown, Inc. v. Zoning Comm'n of D.C., 477 F.2d 402, 409 n.28 (D.C. Cir. 1973) (explaining that courts apply a different standard of review to agency rulemaking and legislative enactments because Congress is responsible to voters and agencies are not).

**D.    To Succeed in an Article XII, Section 7 Challenge to an Administrative Rule, a Plaintiff Must Show the Agency Failed to Adequately Consider or Reasonably Protect Native Hawaiian Traditional and Customary Rights**

Having determined that the Ka Paʻakai framework applies to rulemaking, we also conclude that the framework provides the relevant test for determining whether an administrative rule is constitutional under article XII, section 7.  And as we explained, different contexts require different approaches.  Accordingly, we hold that to succeed in an article XII, section 7 constitutional challenge to administrative rules, a plaintiff must show: (1) the agency failed to adequately consider "the identity and scope of" Native Hawaiian traditional and customary rights affected by the rule, if any; or (2) the agency failed to adequately consider "the extent to which" Native Hawaiian traditional and customary rights "will be affected or impaired by the [rule]"; or (3) the rule failed to "reasonably protect" Native Hawaiian traditional and customary rights, "if they are found to exist," as balanced with the State's own regulatory right.[17]  See id. at 47, 7 P.3d at 1084 (emphasis added).

This test sets forth both the steps agencies must take prior to promulgating rules and the standard by which rules will be judged under article XII, section 7.  This test places the

---

[17]    We note the use of "or" in this test.  If the plaintiff meets its burden as to any one of the three prongs, the rule is unconstitutional.

burden on a plaintiff challenging an administrative rule under article XII, section 7, to show that the analysis undertaken during rulemaking did not adequately consider the scope or impact of a rule on Native Hawaiian traditional and customary practices or that the rule did not reasonably protect those rights as balanced with the State's right to regulate. This test requires courts to balance an agency's "affirmative duty" to protect these rights with "the right of the State to regulate such rights." See id. at 45, 7 P.3d at 1082; Haw. Const. art. XII, § 7.

Balancing the State's "affirmative duty" with its "right" to regulate is consistent with our past precedents. From the outset, we have interpreted article XII, section 7 to require a contextual balancing approach that weighs Native Hawaiian rights against other State interests. In Kalipi, the first case to interpret article XII, section 7, William Kalipi asserted a right to gather traditional agricultural products on land belonging to the defendant in accord with his family's longstanding practice. 66 Haw. at 3-4, 656 P.2d at 747. Chief Justice Richardson, writing for the court, held "that the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." Id. at 10, 656 P.2d at 751.

27

For example, traditional and customary usage may continue "so long as no actual harm is done thereby." Id. However, the court held that these rights may be reasonably regulated, for example by preventing gathering on "fully developed property." Id. at 8-9, 656 P.2d at 750.

The same balancing principles articulated in Kalipi are also relevant here. When courts review the constitutionality of administrative rules under article XII, section 7, they should look to the process by which the rules were adopted. Did the agency adequately consider whether its proposed rule would impact Native Hawaiian traditional and customary rights or practices? If the agency identified impacted rights or practices, did it adequately consider the extent to which those rights or practices would be impaired? And finally, did the agency reasonably protect those rights or practices as balanced with the State's right to regulate?

We reiterate that the burden of showing the agency failed to adequately consider or reasonably protect Native Hawaiian traditional and customary rights or practices remains with the plaintiff. The plaintiff must make affirmative arguments as to why the agency's analysis fails to pass constitutional muster. It is the plaintiff's burden to show the rule is unconstitutional.

At bottom, the constitution requires that agencies "<u>may not act</u> without independently considering the effect of their actions on Hawaiian traditions and practices." <u>Ka Pa'akai</u>, 94 Hawai'i at 46, 7 P.3d 1083 (emphasis added). Thus, when agencies fail to adequately consider or reasonably protect Native Hawaiian traditional or customary rights or practices during rulemaking, the rule is unconstitutional.

1. **<u>Salerno</u>'s "No Set of Circumstances" Test Does Not Apply to Constitutional Challenges Arising from Article XII, Section 7**

In its amicus brief, the Attorney General (AG) argues that FCO brings a facial challenge and that "[w]hen an administrative rule is subject to a facial constitutional challenge, the challenger must establish that no set of circumstances exists under which the rule would be valid." The AG argues that <u>Salerno</u>'s "no set of circumstances" test "is the national standard" for reviewing facial challenges and should be applied to constitutional challenges arising from article XII, section 7.[18] This is incorrect,[19] and even if it were, the U.S.

---

[18] In <u>United States v. Salerno</u>, the U.S. Supreme Court initially explained that facial challenges are "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). But as the Tenth Circuit explained in <u>Doe v. City of Albuquerque</u>:

> The [U.S.] Supreme Court has repeatedly entertained facial challenges without engaging in th[e] hypothetical exercise [required by <u>Salerno</u>]. Instead, the Court has
>
> (continued . . .)

Supreme Court's determination in Salerno would not control how this court interprets the Hawai'i Constitution. See State v. Hoey, 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (explaining that the Hawai'i Supreme Court is "the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution"). We hold that the relevant constitutional test for determining the constitutionality of an administrative rule for the purposes of article XII, section 7 is not Salerno's "no set of circumstances" test. We reiterate that the relevant constitutional test is as follows: to succeed in an article XII, section 7 constitutional challenge to administrative rules, a plaintiff must show: (1) the agency failed to adequately consider "the identity and scope of" Native Hawaiian traditional and customary rights affected by the rule, if any; or (2) the agency failed to adequately consider "the extent to which" Native Hawaiian traditional and customary rights "will be

_____

(. . . continued)
       properly applied the appropriate constitutional test to the
       restriction at issue; for example, the Ward test to a
       content-neutral restriction on free speech rights. Thus,
       Salerno is correctly understood not as a separate test
       applicable to facial challenges, but a description of the
       outcome of a facial challenge in which a statute fails to
       satisfy the appropriate constitutional framework.

667 F.3d 1111, 1123 (10th Cir. 2012).

    [19] Salerno "is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard." Doe, 667 F.3d at 1127 (emphasis added).

affected or impaired by the [rule]"; or (3) the rule failed to "reasonably protect" Native Hawaiian traditional and customary rights, "if they are found to exist," as balanced with the State's own regulatory right.  See Ka Pa'akai, 94 Hawai'i at 47, 7 P.3d at 1084 (emphasis added).

### V.  CONCLUSION

Native Hawaiian traditional and customary rights do not exist at the sufferance of the State and its agencies. These rights must be protected and indeed, the State and its agencies have a constitutional obligation to do so.  For the foregoing reasons, we remand this matter to the circuit court for further proceedings consistent with this opinion.

Ashley K. Obrey                     /s/ Mark E. Recktenwald
Daylin-Rose H. Heather
David Kauila Kopper                 /s/ Michael D. Wilson
for Plaintiff-Appellant
Flores-Case 'Ohana

Joseph F. Kotowski, III
for Defendant-Appellee
University of Hawai'i

David D. Day
Kimberly T. Guidry
for Amicus Curiae,
Attorney General of
Hawai'i

