*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-19-0000668
17-SEP-2025
08:34 AM
Dkt. 43 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

ROWENA AKANA,
Petitioner/Respondent-Appellant-Appellant,

vs.

HAWAIʻI STATE ETHICS COMMISSION,
Respondent/Complainant-Appellee-Appellee.

SCWC-19-0000668

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000668; CASE NO. 1CC191000379;
AGENCY CASE NO. COMPL-C-15-00236)

SEPTEMBER 17, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

<u>OPINION OF THE COURT BY RECKTENWALD, C.J.</u>

## I.    INTRODUCTION

Under article XIV of our state constitution, the people of Hawaiʻi hold public officers and employees to "the highest standards of ethical conduct."  "To keep faith with this belief," the legislature and each political subdivision have

adopted a code of ethics and established an ethics commission to apply to their employees, as well as members of boards, commissions and other bodies, to ensure "the personal integrity of each individual in government." Haw. Const. art. XIV. This case requires us to determine whether the State Ethics Code (Ethics Code) applies to trustees of the Office of Hawaiian Affairs (OHA), a semi-autonomous State entity whose mission is to better the conditions of Native Hawaiians. Absent the legislature's designation of OHA as a political subdivision, we conclude OHA trustees are subject to the Ethics Code and the Hawai'i State Ethics Commission (Commission) under Hawai'i Revised Statutes (HRS) chapter 84.

In 2019, the Commission charged Rowena Akana, then-trustee of the Office of Hawaiian Affairs, for violating several provisions of the Ethics Code related to her spending of trustee allowance funds and acceptance of paid legal fees from OHA beneficiary Abigail Kawānanakoa. After a contested case hearing, the Commission determined Akana violated the fair treatment, gifts, and gifts reporting provisions of HRS chapter 84, and fined her for those violations. The Circuit Court of the First Circuit (circuit court), and later the Intermediate Court of Appeals (ICA), affirmed the Commission's decision.

Before this court, Akana contests (1) whether the Commission has jurisdiction over OHA trustees, and (2) whether

she violated the gifts and gift reporting laws for her acceptance of legal fees. Akana argues the Commission lacks jurisdiction to issue charges against OHA trustees because OHA is a political subdivision that must have its own ethics code and ethics commission. We disagree.

We hold that OHA is not a political subdivision such that it requires a separate ethics apparatus and therefore conclude the Commission had jurisdiction over charges of Ethics Code violations brought against Akana. Although there is no conflict here between OHA's governing laws and the Ethics Code, we also recognize OHA trustees' unique responsibilities and powers to better the conditions of Native Hawaiians, and therefore require the Commission to defer to OHA bylaws and policy when considering charges against its trustees.

Because we also conclude the Commission did not err in determining Akana violated the gifts and gifts reporting laws, we accordingly affirm the judgment of the ICA.

## II.  BACKGROUND

### A.  The Hawai'i State Ethics Code and Commission

Promoting public trust in the government and its officials is a longstanding principle in Hawai'i. See Stand. Comm. Rep. No. 26, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 565 (1980) ("Hawai'i

3

established what is generally considered to be the first comprehensive state ethics code in the nation in 1967."). In 1968, delegates to the constitutional convention proposed, and the people of Hawai'i later ratified, article XIV requiring "[t]he legislature and each subdivision [to] adopt a code of ethics for appointed and elected officers and employees of the State or the political subdivision, including members of boards." Stand. Comm. Rep. No. 44, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 210 (1973).

The 1968 delegates explained that mandating codes of ethics for both "the state government and the various counties" would "guarantee the existence of a code of ethics for all public employees and officers." Id. (emphasis added). The legislature accordingly enacted a comprehensive State Ethics Code and established the Hawai'i State Ethics Commission, which is now codified in HRS chapter 84. 1972 Haw. Sess. Laws Act 163, at 539-48.

At the 1978 Constitutional Convention, the Committee on Ethics significantly expanded, and the voters later ratified, a more robust system of ethics regulation. Stand. Comm. Rep. No. 26, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 564-65. Delegates believed "statutory ethics codes [would] have little meaning if they are not administered

through independent bodies," and required that ethics commissions be established to administer the State and counties' ethics codes.  Id. at 567.[1]  In addition to implementing codes of ethics, delegates noted that the duties of ethics commissions would include, "investigating possible violations by any state official, elected or appointed; recommending disciplinary actions for such violations to the appropriate governmental subdivisions; [and] registering and regulating lobbyists and performance other duties as provided by law."  Digest of Proposals Offered by Delegates, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 924.

Today, in addition to the duties outlined by the delegates to the 1978 Constitutional Convention, the Commission renders advisory opinions upon the request of any state official, considers and adjudicates charges of Ethics Code violations, and conducts regular trainings for state officials on matters of ethics.  HRS § 84-31 (Supp. 2024) (describing the duties of the Commission).  Notably, this specifically includes OHA trustees.  HRS § 84-42 (Supp. 2024) (mandating the Commission conduct live ethics trainings for certain state

---

[1]     The 1978 amendments to article XIV also specified the minimum components that ethics codes must include, including provisions related to "gifts, confidential information, use of position, contracts with government agencies, post-employment, financial disclosure and lobbyist registration and restriction."  Haw. Const. art. XIV; Stand. Comm. Rep. No. 26, in Proceedings of the Constitutional Convention of Hawai'i of 1978, at 567.

officials, including OHA trustees). The Commission carries out its duties "so that public confidence in public servants will be preserved." HRS ch. 84 Preamble (2012).

Three provisions of the Ethics Code are relevant to this opinion: (1) the fair treatment law, HRS § 84-13 (2012), (2) the gifts law, HRS § 84-11 (2012), and (3) the gifts reporting law, HRS § 84-11.5 (2012). Each provision is to be "liberally construed to promote high standards of ethical conduct in state government." HRS § 84-1 (2012).

The fair treatment law bars legislators and state employees from "us[ing] or attempt[ing] to use [their] official position to secure or grant unwarranted privileges, exemptions, advantages, contracts, or treatment for oneself or others[.]" HRS § 84-13. This prohibition includes, but is not limited to the following conduct:

> (2)  Accepting, receiving, or soliciting compensation or other consideration for the performance of the legislator's or employee's official duties or responsibilities except as provided by law.
>
> (3)  Using state time, equipment or other facilities for private business purposes.
>
> (4)  Soliciting, selling, or otherwise engaging in a substantial financial transaction with a subordinate or a person or business whom the legislator or employee inspects or supervises in the legislator's or employee's official capacity.

Id.

The gifts and gifts reporting laws concern a state official's acceptance of gifts in the performance of their

6

official duties.  The gifts law outlines the types of prohibited gifts, and provides:

> No legislator or employee shall solicit, accept, or receive, directly or indirectly, any gift, whether in the form of money, service, loan, travel, entertainment, hospitality, thing, or promise, or in any other form, under circumstances in which it can be reasonably inferred that the gift is intended to influence the legislator or employee in the performance of the legislator's or employee's official duties or is intended as a reward for any official action on the legislator or employee's part.

HRS § 84-11.

The gifts reporting law, on the other hand, concerns the public disclosure of gifts.  During the relevant period, the gifts reporting law provided:

> (a) Every legislator and employee shall file a gifts disclosure statement with the state ethics commission on June 30 of each year if all the following conditions are met:
>
> (1)   The legislator or employee, or spouse or dependent child of a legislator or employee, received directly or indirectly from one source any gift or gifts valued singly or in the aggregate in excess of $200, whether the gift is in the form of money, service, goods, or in any other form;
>
> (2)   The source of the gift or gifts have interests that may be affected by official action or lack of action by the legislator or employee; and
>
> (3)   The gift is not exempted by subsection (d) from reporting requirements under this subsection.
>
> (b) The report shall cover the period from June 1 of the preceding calendar year through June 1 of the year of the report.
>
> (c) The gifts disclosure statement shall contain the following information:
>
> (1)   A description of the gift;
>
> (2)   A good faith estimate of the value of the gift;
>
> (3)   The date the gift was received; and

7

>           (4)     The name of the person, business entity, or
>                   organization from whom, or on behalf of whom,
>                   the gift was received.

HRS § 84-11.5 (2012).

The legislature enacted the gifts reporting law in 1992 "to promote public confidence in our government" and bolster the Commission's work to "monitor and prevent any abuse that may arise in situations involving election campaigns or the duties and services of a public official."  Conf. Comm. Rep. No. 41, in 1992 House Journal, at 808.  Despite the reporting requirement being a "slight inconvenience," the legislature emphasized that filing gift disclosure statements provides a pathway "to gain redress against acts of abuse committed by our public officials" and "ensure fairness."  Id.

## B.  The Role of OHA Trustees

Established in 1978 by constitutional amendment, OHA is tasked with administering the public trust for Native Hawaiians.  Haw. Const. art. XII, § 5.  It is also "the principle public agency in this State responsible for the performance, development, and coordination of programs and activities relating to native Hawaiians and Hawaiians[.]"[2]  HRS § 10-3(3) (2009).

---

[2]     "Where quoted language in this opinion uses 'native Hawaiian' or 'Hawaiian,' we clarify those references to encompass all Native Hawaiians, which refers to descendants of the indigenous peoples who inhabited the Hawaiian Islands prior to 1778, regardless of blood quantum."  Flores-Case

(continued . . .)

At the 1978 Constitutional Convention – the same convention that significantly expanded the ethics regulatory framework in Hawaiʻi – the Committee on Hawaiian Affairs proposed "the establishment of an elected board of trustees in order to provide a receptacle for any funds, land or other resources earmarked for or belonging to native Hawaiians" and creation of "a body that could formulate policy relating to all native Hawaiians and make decisions on the allocation of those assets belonging to native Hawaiians."  Stand. Comm. Rep. No. 59, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 644.

The Committee on Hawaiian Affairs underscored the semi-autonomous status OHA would assume, and envisioned a nine-member board of trustees to ensure that autonomy:

> Your Committee is unanimously and strongly of the opinion that people to whom assets belong should have control over them.  After much deliberation and attention to testimony from all parts of the State, your Committee concluded that a board of trustees chosen from among those who are interested parties would be the best way to insure proper management and adherence to the needed fiduciary principles.  In order to insure accountability, it was felt that the board should be composed of elected members.

Id.

---

ʻOhana v. Univ. of Haw., 153 Hawaiʻi 76, 82 n.10, 526 P.3d 601, 607 n.10 (2023).

9

In crafting article XII, section 6, which outlines the powers of OHA's board of trustees (Board), the Committee explained:

> Your Committee decided to grant native Hawaiians the right to determine priorities which will effectuate the betterment of their condition and welfare by granting to the board of trustees power to "formulate policy relating to affairs of native Hawaiians." Your Committee created the board of trustees of the Office of Hawaiian Affairs in the Constitution to insure that it would handle the assets and financial affairs of native Hawaiians. It is intended that these <u>powers will include the power to contract, to accept gifts, grants and other types of financial assistance and agree to the terms thereof, to hold or accept legal title to any real or personal property and to qualify under federal statutes for advantageous loans or grants, and such other powers as are inherent in an independent corporate body and applicable to the nature and purpose of a trust entity for native peoples</u>. These powers also include the power to accept the transfer of reparations moneys and land.

Id. at 645 (quoting Haw. Const. art. XII, § 6) (emphasis added).

The following year, in 1979, the legislature implemented article XII, section 6, in what is now codified in HRS chapter 10, which outlines the general powers of the office, HRS § 10-4 (Supp. 2013), and the powers and duties of the nine-member Board, HRS §§ 10-5 (2009), -6 (2009).

**C. Factual Background**

The Commission charged Akana with 53 counts of violating the fair treatment, gifts, and gifts reporting provisions of the Ethics Code. The counts arose from (1) Akana's expenditures of trustee allowance funds, and (2) her acceptance and non-disclosure of legal fees from OHA beneficiary

Kawānanakoa in a lawsuit Akana filed against OHA in both her official and individual capacities.

## 1. Trustee allowance fund expenditures

In November 2013, as "part of an effort to enhance the capacity of Trustees to deal with incidental expenses connected with Trustee duties," the Board's Committee on Asset and Resource Management recommended, and the full Board later approved, the creation of the OHA Board of Trustees' Sponsorship and Annual Allowance Fund (Trustee Allowance Fund). The Trustee Allowance Fund was allocated to cover costs associated with social and charitable functions, travel, registration fees, and to provide other "support to beneficiaries in their quest for self-improvement." It was neither intended to alter trustee compensation, nor "intended to be used for personal gain by a Trustee."

The Board also amended its Executive Policy Manual, which provided that the "primary control" of the Trustee Allowance Fund would be the Executive Policy Manual and the Board's Operations Manual. Notably, it stated that "secondary controls" included "ethics and standards of conduct laws applicable to elected officials, public officers, and state government employees . . . found in [HRS] Chapter 84." Upon approving the Trustee Allowance Fund, the Board directed OHA's

CEO to develop internal guidelines and procedures for administering the funds.

During the relevant period, internal protocol mandated that at the beginning of each fiscal year, trustees received a lump sum allowance of $22,200.00 via check, which was typically deposited into their personal bank accounts. OHA staff then reviewed receipts and other records of their Trustee Allowance Fund expenditures on a quarterly basis. If OHA staff determined that the expenditure was not permitted, it would be "disallowed" and the balance repaid by the trustee. Expenditures were generally allowable if there was "some kind of link" that established the trustee was working with beneficiaries, constituents, or other partners. However, political contributions and other expenditures that personally benefitted the trustees themselves, or their families, were considered contrary to OHA policy.

At the end of each fiscal year, trustees were required to refund any unspent allowance funds to OHA. OHA trustees and staff understood that while administrative staff would conduct quarterly reviews to help trustees comply with the parameters of the Trustee Allowance Fund, trustees were ultimately responsible to ensure their actions did not conflict with OHA policy, their fiduciary duties, or the law.

From 2013 through 2017, Akana spent her Trustee Allowance Fund on a variety of items that later became subject to an Ethics Commission charge.  Expenditures included membership for the Hawaiian Airlines Premier Club, home cable television service, food purchases for herself and OHA staff, and donations to charitable and political organizations.

Some of Akana's Trustee Allowance Fund expenditures such as the Hawaiian Airlines Premier Club membership and cable television service were subsequently "disallowed" by OHA staff for violating OHA policy.  Other items such as food expenses for staff and political contributions were not expressly "disallowed" by OHA staff during their quarterly review, but later found to either personally benefit Akana or be a political contribution expressly prohibited under OHA policy.[3]

## 2. Acceptance of paid legal fees

From September 2013 through November 2017, Akana was involved in a lawsuit against the other eight OHA trustees in their official capacities.  Akana filed the lawsuit in her

---

[3]   The record indicates that following the 2013 amendments to the Trustee Allowance Fund, the volume of expenditures significantly increased, making it difficult for administrative staff to keep up with gathering detailed records of expenditures from trustees.  Several OHA employees also testified that Akana often contested requests for additional information about her Trustee Allowance Fund expenditures and intimidated staff members who made such requests.  The Commission later made the unchallenged finding of fact that "the failure to disallow a prohibited expense was a deficiency in the process of reviewing these expenditures" but "the fact that an expenditure was not disallowed does not necessarily mean that the expenditure was allowable pursuant to OHA policy."

official and individual capacities, seeking declaratory and injunctive relief related to beneficiaries' access to records related to the Board's executive session meetings. The other trustees voted in favor of filing a counterclaim against Akana, which alleged that she breached her fiduciary duty by disclosing privileged and confidential information. OHA's insurance carrier declined to cover Akana's attorneys' fees resulting from the Board's counterclaim.

OHA beneficiary Kawānanakoa believed the case involved important issues warranting her financial support. Through her attorney, Kawānanakoa offered to pay for Akana's legal fees, which Akana accepted. In June 2015, the eight other OHA trustees prevailed in their counterclaim against Akana when a court granted their motion for summary judgment. Kawānanakoa continued to pay Akana's legal fees until the parties settled Akana's lawsuit in November 2017. Between July 2015 and November 2017, Kawānanakoa paid Akana's counsel more than $72,000 in legal fees.[4]

---

[4] Kawānanakoa paid Akana's legal fees on seven occasions: (1) $10,478.52 on July 1, 2015, (2) $9,521.48 on August 10, 2015, (3) $6,000.00 on March 24, 2016, (4) $24,125.50 on April 19, 2016, (5) $447.28 on December 16, 2016, (6) $15,513.15 on April 28, 2017, and (7) $6,000.00 on June 17, 2017.

In June 2017, Akana initially reported to the Commission her acceptance of $15,960.43 in paid legal fees from Kawānanakoa, but did not disclose the date she accepted those fees. Akana eventually filed amended gifts disclosure statements for the July 2015–June 2016 and July 2016–June 2017 periods with the Commission in September 2017, reporting her acceptance

(continued . . .)

In February 2017, nine months before Akana's lawsuit settled, Kawānanakoa filed her own lawsuit seeking declaratory and injunctive relief to set aside an employment contract between OHA and its CEO. The lawsuit named OHA, Board Chairperson Robert K. Lindsey, and CEO Kamana'opono Crabbe as defendants. Akana participated in at least one executive session meeting of the Board on March 9, 2017, regarding Kawānanakoa's lawsuit. While the lawsuit was pending, Akana continued to accept legal fees paid by Kawānanakoa on two occasions, totaling more than $21,000.[5]

D. Commission Proceedings

On April 19, 2018, Akana was charged with 53 Ethics Code violations of (1) the fair treatment law, HRS § 84-13, for certain Trustee Allowance Fund expenditures, and (2) the gifts and gifts reporting laws, HRS §§ 84-11 and -11.5, related to Akana's acceptance of legal fee payments from OHA beneficiary Kawānanakoa after Kawānanakoa filed a separate lawsuit against OHA.[6]

---

of seven installments of legal fees payments from Kawānanakoa totaling $72,085.93.

[5] Kawānanakoa paid Akana's legal fees in the amount of (1) $15,513.23 on April 28, 2017, and (2) $6,000.00 on June 17, 2017 after Kawānanakoa filed her February 2017 lawsuit against OHA.

[6] As both the adjudicatory body and entity bringing an ethics charge against Akana, the Commission ordered a "firewall" between counsel advising the Commission and counsel presenting the case against Akana. In this opinion, "Commission" refers to the State Ethics Commission in its

(continued . . .)

In response to the charge, Akana argued the Commission lacked jurisdiction because it had no authority "over OHA trust funds with respect to determining the character of and necessity for Trustee expenditures, and the manner in which they shall be incurred, allowed, and paid, which authority is reserved for OHA pursuant to HRS § 10-4." Akana also contended that payments for legal fees and costs by Kawānanakoa were not "gifts" because Akana sued the defendant trustees in her official capacity, and neither the State nor OHA provided her with the necessary legal defense.

Prior to conducting a contested case hearing, the Commission determined it had jurisdiction over the matter. It concluded Akana, as an OHA trustee, was an "employee" under the Ethics Code and was thus subject to the Code. The Commission further emphasized that the charge against Akana did not concern whether her actions breached her fiduciary duty as an OHA trustee, rather the charge concerned whether her actions as an OHA trustee violated the Ethics Code.

The Commission conducted a contested case hearing in October 2018, where it heard from former OHA administrative staff, counsel, and Akana. On February 5, 2019, the Commission entered its Findings of Fact, Conclusions of Law, and Decision

_____

adjudicatory role, while "charge counsel" refers to the State Ethics Commission acting in its charge capacity.

and Order (Decision and Order), which determined Akana violated the Ethics Code in 47 of the 53 counts alleged by the charge counsel. The Commission determined Akana, as a State employee subject to the State Ethics Code, violated the fair treatment law for certain Trustee Allowance Fund expenditures, including Hawaiian Airlines Premier Club membership, cable television services, and food expenses for OHA staff. It further determined that, while not all 41 fair treatment law violations were disallowed by OHA staff, they all violated OHA policy.

The Commission also concluded Akana violated the gifts law for her acceptance of more than $21,000 in paid legal fees after Kawānanakoa filed a separate lawsuit against OHA, and violated the gifts reporting law for failing to timely disclose her acceptance of more than $50,000 in paid legal fees from Kawānanakoa in 2015 and 2016.

The Commission fined Akana $23,106.53 for her violations. Akana appealed the Commission's Decision and Order to the circuit court.

E. **Appellate Proceedings**

The circuit court,[7] and later the ICA in a memorandum opinion, affirmed the Commission's Decision and Order, concluding the Ethics Code applied to Akana and the Commission

---

[7] The Honorable James H. Ashford presided.

17

did not err when it determined Akana violated the fair treatment, gifts, and gifts reporting law in 47 of the 53 counts.

In her application for writ of certiorari, Akana raises two primary issues: (1) the Commission's jurisdiction over OHA trustees, and (2) the applicability of the gifts and gifts reporting laws to her acceptance of legal fees in a matter related to her trustee duties.  We review each issue in turn.

## III. STANDARDS OF REVIEW

### A.  Administrative Agency Appeals

> [W]hen reviewing a determination of an administrative agency, we first decide whether the legislature granted the agency discretion to make the determination being reviewed. If the legislature has granted the agency discretion over a particular matter, then we review the agency's action pursuant to the deferential abuse of discretion standard (bearing in mind the legislature determines the boundaries of that discretion).  If the legislature has not granted the agency discretion over a particular matter, then the agency's conclusions are subject to de novo review.

Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 419–20, 91 P.3d 494, 501–02 (2004).

> An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error. A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.

Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, AFL-CIO, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (internal quotation marks, citations, and brackets omitted).

**B.  Agency Jurisdiction**

An administrative agency "may always determine questions about its own jurisdiction." HOH Corp. v. Motor Vehicle Indus. Licensing Bd., Dep't of Com. & Consumer Affs., 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987).  "The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard."  In re Kanahele, 152 Hawai'i 501, 509, 526 P.3d 478, 486 (2023) (quoting Lingle v. Haw. Gov't Emps. Ass'n, AFSCME, Local 152, 107 Hawai'i 178, 182, 111 P.3d 587, 591 (2005)).

**C.  Statutory Interpretation**

Statutory interpretation is a question of law reviewable de novo.  Our construction of statutes is guided by the following principles:

> First, the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third,  implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawai'i 1, 10–11, 332 P.3d 144, 153–54 (2014) (internal quotation marks omitted) (quoting First Ins. Co. of Haw. v. A&B Props., 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012)).

19

## IV. DISCUSSION

The fundamental dispute in this case is the applicability of the Ethics Code and the Commission's jurisdiction over OHA trustees. Akana maintains the Commission lacks jurisdiction over OHA trustees, and even if it did, her acceptance of legal fees from Kawānanakoa did not violate the gifts and gifts reporting laws. We disagree, and hold that Akana is subject to the Ethics Code and the Commission's jurisdiction. We also conclude the Commission did not clearly err in determining that Akana violated the gifts and gifts reporting laws.

**A. OHA Trustees are Subject to the State Ethics Code and Commission**

Article XII, sections 5 and 6 were painted with broad strokes, establishing the foundation of a public agency independent from the executive branch with a unique mandate to improve the wellbeing of Native Hawaiians. Significantly, it left the details of OHA's implementation to be determined by the legislature. Haw. Const. art. XVIII, § 8 ("The legislature shall provide for the implementation of the amendments to Article XII in Sections 5 and 6 on or before the first general election following ratification of the amendments to Article XII in Sections 5 and 6."). The legislature filled in the details through HRS chapter 10, outlining OHA's purpose and powers as

20

well as providing operational guidelines for its staffing, budgeting, and compensation.

A plain reading of HRS chapters 10 and 84 and their legislative histories indicates the legislature's intent for OHA trustees to be subject to the Ethics Code and the Commission. Accordingly, we hold that Akana is subject to the Ethics Code and oversight by the Commission.

1. **The legislature did not designate OHA as a political subdivision that requires a separate ethics commission**

Akana argues for the first time before this court that, due to OHA's unique status as a "separate entity independent of the executive branch," OHA is a political subdivision such that it is subject to its own ethics code and commission. See Haw. Const. art. XIV ("Each code of ethics shall be administered by a separate ethics commission[.]"). The Commission, on the other hand, contends that OHA's governing laws - article XII, sections 5 and 6, and HRS chapter 10 - differ significantly from the authority given to "political subdivisions" under article VIII, section 2 of the Hawai'i Constitution.[8]

---

[8] Article VIII, section 2 of the Hawai'i Constitution provides:

> Each political subdivision shall have the power to frame and adopt a charter for its own self-government within such limits and under such procedures as may be provided by general law. Such procedures, however, shall

(continued . . .)

Generally, we do "not consider an issue not raised below unless justice so requires." Bitney v. Honolulu Police Dep't, 96 Hawai'i 243, 251, 30 P.3d 257, 265 (2001) (noting when deciding whether to address a new issue raised on appeal, the appellate court must decide "whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public importance"). Here, justice so requires. Article XIV provides that "each political subdivision . . . shall adopt a code of ethics which shall apply to [its] appointed and elected officers and employees[.]" Accordingly, if OHA were a political subdivision, it would fall outside the Commission's jurisdiction and be required to adopt its own code of ethics to be administered by a separate ethics commission. Therefore, the threshold question of whether OHA is a political subdivision is dispositive to determining the Commission's jurisdiction over

---

not require the approval of a charter by a legislative body.

Charter provisions with respect to a political subdivision's executive, legislative and administrative structure and organization shall be superior to statutory provisions, subject to the authority of the legislature to enact general laws allocating and reallocating powers and functions.

A law may qualify as a general law even though it is inapplicable to one or more counties by reason of the provisions of this section.

22

OHA trustees.  Given the legislative history of OHA's governing laws, we hold that OHA is not a political subdivision under article VIII of the Hawai‘i Constitution.

Although OHA is uniquely situated as an independent public entity for the "betterment of conditions of native Hawaiians," it does not fit the mold of a political subdivision.  See HRS § 10-1(a) (2009).  Under article VIII, section 2, political subdivisions "have the power to frame and adopt a charter for [their] own self-government."  While the legislature has the power to create "other political subdivisions within the State," article XII and HRS chapter 10 do not confer such powers to OHA.  See Haw. Const. art. VIII, § 1 ("The legislature shall create counties, and may create other political subdivisions within the State, and provide for the government thereof.").[9]

---

[9]    Since article VIII was first ratified in 1968, the term "political subdivision" has been used in relation to the counties.  See, e.g., Haw. Insurers Council v. Lingle, 120 Hawai‘i 51, 59 n.4, 201 P.3d 564, 572 n.4 (2008) ("'[P]olitical subdivision' as it appears in article VIII, section 3 of the Hawai‘i Constitution refers to counties.") (brackets omitted); Nakano v. Matayoshi, 68 Haw. 140, 144, 706 P.2d 814, 817 (1985) (noting that the County of Hawai‘i implemented its own ethics code according to article XIV's mandate "for the adoption of ethics codes consistent with the article by the State's political subdivisions").

Akana argues that OHA meets the criteria of a "political subdivision" because (1) the office is a public entity with discretionary power over its administration and funding, and (2) OHA is administered by elected trustees. In doing so, she urges this court to adopt the Fourth Circuit's "political subdivision" analysis.  See Nat'l Lab. Rels. Bd. v. Princeton Mem'l Hosp., 939 F.2d 174, 177-78 (4th Cir. 1991) (holding that entities that are "administered by individuals who are responsible to public officials or to the general electorate" and "demonstrate that its policy-making officials have direct personal accountability to public officials or to the general public" may be classified as a "political subdivision") (citations and internal quotation marks omitted).  We decline to adopt the Fourth Circuit's
(continued . . .)

Rather than establishing a "political subdivision," delegates to the 1978 Constitutional Convention intended OHA to "assume the status of a state agency" independent from the other branches of government.  Stand. Comm. Rep. No. 59, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 645.  As an independent state agency, the 1978 delegates "unanimously and strongly" were of the "opinion that people to whom assets belong should have control over them."  Id. at 644.  Therefore, in crafting article XII, section 5, delegates envisioned that OHA would occupy a "unique and special" semi-autonomous status, with an elected board of trustees exercising maximum control over OHA's budget and assets.  Id. at 645.  This structure, the delegates concluded, would "provide Hawaiians the right to determine the priorities" to "effectuate the betterment of their condition and welfare," while also ensuring "accountability and opportunity for scrutiny of the trustees."  Comm. of the Whole Rep. No. 13, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1018.

The implementation of OHA was largely left to the legislature, which it undertook the following year in Act 196, now codified in HRS chapter 10.  Haw. Const. art. XVIII, § 8

_____

test here, given article VIII's clear mandate that the legislature has the authority to create political subdivisions within the State.  Haw. Const. art. VIII, § 2.  Absent any legislative action expressly designating OHA a "political subdivision," we decline to expand the political subdivision classification here.

("The legislature shall provide for the implementation of the amendments to Article XII in Sections 5 and 6 on or before the first general election following ratification of the amendments to Article XII in Sections 5 and 6."). Act 196 outlined OHA's purpose and trustee powers, and provided operational guidelines such as staffing, appropriations and budgeting, and compensation. 1979 Haw. Sess. Laws Act 196, at 398-408.

Notably, the legislature followed through on the 1978 delegates' expectation that OHA would assume the status of a state agency. Rather than defining OHA as a "political subdivision," the legislature defined OHA as a "body corporate" and the "principal public agency in the State responsible for the performance, development, and coordination of programs and activities relating to native Hawaiians and Hawaiians." HRS §§ 10-4, -3(3). This suggests that OHA constitutes an entity independent from the executive branch yet still under the umbrella of the State government.[10]

---

[10] Although the legislature does not define "body corporate," Black's Law Dictionary defines the term as "a group . . . established in accordance with legal rules into a legal or juristic person that has a legal personality distinct from the natural persons who make it up, exists indefinitely apart from them, and has the legal powers that its constitution gives it." Corporation, Black's Law Dictionary (12th ed. 2024). This definition appears to encompass OHA's status as an independent entity with distinct rights and responsibilities under the Hawai'i Constitution. "Political subdivision," on the other hand is defined as "a division of a state that exists primarily to discharge some function of local government," which does not accurately describe OHA's duties to administer public trust assets for its Native Hawaiian beneficiaries. See Political Subdivision, Black's Law Dictionary (12th ed. 2024).

A plain reading of HRS chapter 84 also indicates the legislature's intent that OHA trustees fall under the umbrella of the Ethics Code and the Commission's jurisdiction. Chapter 84 expressly mentions OHA trustees in two of its provisions: first, in mandating that trustees' financial disclosure statements be available to the public; and second, in requiring OHA trustees to complete a live ethics training course. HRS §§ 84-17(d)(1), -42(a). These provisions would be irrelevant if the Ethics Code did not apply to OHA trustees.

Further, HRS chapter 84 applies to "every nominated, appointed, or elected officer, employee, and candidate to elected office of the State." HRS § 84-2 (2012). "Employee" under HRS chapter 84 is defined as "any nominated, appointed, or elected officer or employee of the State, including members of boards . . . but excluding legislators, delegates to the constitutional convention, justices and judges." HRS § 84-3 (2012). While legislators, judges, and constitutional convention delegates are expressly excluded from this definition, OHA trustees are not, suggesting their inclusion as "employee[s]" under HRS chapter 84. See In re Maui Fire Cases, 155 Hawai'i 409, 428, 565 P.3d 754, 773 (2025) ("[I]t is generally presumed that the legislature acts intentionally and purposely in the disparate inclusion or exclusion of terms in its statutes." (citation omitted)). Thus, given the plain

language of HRS chapters 10 and 84, we affirm the Commission, circuit court, and ICA's conclusions that OHA trustees are subject to the Ethics Code and oversight by the Commission.

The broader proceedings of the 1968 and 1978 Constitutional Conventions further support this conclusion. At the 1968 Constitutional Convention, delegates debated at length about whether a separate ethics code should be carved out for judges and the counties. See, e.g., Stand. Comm. Rep. No. 44, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 210 ("Since the judiciary has its own canons of ethics, the matter of exempting the judicial branch from [the Ethics Code] was discussed at length."). Delegates ultimately decided to insert a provision in article XIV "mandating a code of ethics for each governmental unit" to "guarantee the existence of a code of ethics for all public employees and officers." Id.; see Haw. Const. art. XIV ("[T]he legislature, each political subdivision and the constitutional convention shall adopt a code of ethics which shall apply to appointed and elected officers and employees of the State or the political subdivision, respectively.").

Similarly, at the 1978 Constitutional Convention – the Convention that resulted in the establishment of OHA – the same issue of including justices and judges under the Ethics Code was raised. Again, delegates noted that because judges "have their

own self-policing canons of ethics," they are "exempted by the legislature from the state ethics statute which applies to all other state officials and employees." Debates in the Committee of the Whole on Code of Ethics, in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 35 (1980). Yet, neither the Hawaiian Affairs Committee nor the Ethics Committee at the 1978 Constitutional Convention discussed whether OHA would need its own separate ethics code and body. See generally Debates in the Committee of the Whole on Hawaiian Affairs, in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 456-62 (debating proposals to establish OHA); Debates in Committee of the Whole on Code of Ethics, in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1-38 (debating ethics code proposals). Against the backdrop of the delegates' intent that a code of ethics apply to all public employees and officers, and that a board of trustees governing structure enhances "decision-making accountability" to its beneficiaries, this silence suggests that OHA trustees are subject to the Commission's jurisdiction and the Ethics Code.

Thus, while OHA was intended to have "maximum independence" to better the conditions of Native Hawaiians, the legislature established OHA as a semi-autonomous state agency rather than a "political subdivision." Because OHA is not a "political subdivision" required to adopt its own ethics code

28

and establish its own ethics commission, we therefore hold OHA trustees, including Petitioner Akana, are subject to the Ethics Code and the Commission's jurisdiction.[11]

### 2. The Ethics Code does not conflict with Akana's fiduciary duties

Citing Boyd v. State Ethics Commission, 138 Hawai'i 218, 228, 378 P.3d 934, 944 (2016), Akana argues that even if OHA is not a political subdivision, she is statutorily exempted from the Ethics Code because her fiduciary obligations under HRS chapter 10 conflict with the conduct required of state employees under the Ethics Code. Akana contends that by establishing OHA trustees as fiduciaries with the exclusive authority over trust assets, HRS chapter 10's "legislative regime" created standards of conduct for OHA trustees that conflict with the standards of conduct required under the Ethics Code. We disagree, and hold that Boyd does not preclude the Commission from exercising its jurisdiction over Akana.

In Boyd, this court held the conflict of interest provisions in the Ethics Code did not apply to charter school employees because a separate statutory scheme required charter schools to submit a detailed implementation plan containing a

---

[11]    Records from the Commission's training workshop with OHA trustees further support this conclusion. In a 2015 training with the Board, Les Kondo from the Commission emphasized that the Ethics Code applied both to elected trustees and OHA employees when reviewing pertinent standards of conduct such as gifts, gift reporting, and misuse of position.

conflict of interest policy to the Board of Education, which served as the basis for the Board of Education to hold charter schools accountable for their operations, finances, and management. 138 Hawai'i at 226-27, 378 P.3d at 942-43 (citing HRS §§ 302B-5(d) (2007) (repealed 2012), -6(d)(6) (2007) (repealed 2012)). Because the statutory scheme did not require charter schools' internal conflict of interest policies and procedures to be consistent with the Ethics Code, we reasoned that charter school employees "could have been subject to punishment under one set of standards, but not the other, for the same conduct." Id. at 228, 378 P.3d at 944. Thus, we held the Commission lacked authority to adjudicate proceedings against the Boyd plaintiff for conflict of interest violations under the Ethics Code. Id.

The circumstances here differ from those in Boyd. While the legislature similarly crafted HRS chapter 10 to provide OHA the "discretion and autonomy to operate independently and separately" from the Executive Branch, it did not mandate that OHA establish its own internal procedure and policies governing trustee conduct. Cf. id. at 226, 378 P.3d at 942 (concluding the legislature enacted a statutory scheme that required charter schools to establish standards of conduct for their employees). The legislature also did not require OHA to

30

develop gifts or fair treatment policies for its trustees and employees.

Akana points to HRS §§ 10-4 and -4.5 (2009), which outline OHA's general powers and authority over disbursements, as provisions directly in conflict or inconsistent with the Ethics Code. She contends that by the legislature conferring authority to OHA, through its Board, to "take such actions as may be necessary or appropriate to carry out the powers conferred upon it by law," OHA trustees could be in violation of the Ethics Code for carrying out their fiduciary duties to OHA beneficiaries. See HRS § 10-4(9).

These HRS chapter 10 provisions, however, broadly confer the nine-member Board discretionary powers to effectuate OHA's work to better the conditions of Native Hawaiians. See id. HRS § 10-4.5 confers the "office" – not individual trustees – "the power to make all necessary and appropriate disbursements of its moneys[.]" HRS § 10-4.5(a). Further, while the Board is authorized "[t]o determine the character of and necessity for its obligations and expenditures," its discretionary power is "subject to provisions of law specifically applicable to the office." HRS § 10-4(3). This includes "bylaws governing the conduct of its business" such as OHA policy that notes a "secondary control" of Trustee Allowance Fund expenditures is the Ethics Code. See HRS § 10-4(1). In other words, these

31

provisions do not account for the standards of conduct with which <u>individual</u> trustees must comply, nor do they provide trustees unfettered discretion to take individual action the trustee believes is in furtherance of their fiduciary duties. We therefore conclude the Board's discretion under HRS chapter 10 is not inconsistent or in conflict with the Ethics Code and its regulation of individual state officials' conduct. See HRS § 10-4(9) (authorizing the Board "[t]o take such actions as may be necessary or appropriate to carry out the power conferred upon it by law").

OHA's internal policy and practices also support the conclusion that HRS chapter 10 does not conflict with the Ethics Code. OHA's Executive Policy Manual, which serves as the Board's bylaws, explicitly requires trustees to "abide by the Standards of Conduct of the State of Hawai'i, Chapter 84, Hawai'i Revised Statutes, as amended" and "attend ethics training" required under chapter 84. See HRS § 84-42(a) ("[T]rustees of the office of Hawaiian affairs . . . shall complete a live ethics training course administered by the state ethics commission within ninety days of taking office and at least once every four years thereafter.").

In establishing the Trustee Allowance Fund, the Board's Committee on Asset and Resource Management noted that although the "primary control" for use of the Allowance Fund

would be the Executive Policy and Board of Trustees Operation Manuals, "secondary controls" would include "ethics and standards of conduct laws applicable to elected officials, public officers, and state government employees . . . found in Hawai'i Revised Statutes Chapter 84." Moreover, during the relevant period, OHA policy provided that expenditures of the Trustee Allowance Fund "may be disallowed because (1) they are contrary to OHA's mission to better the conditions of Hawaiians or (2) <u>it contravenes the [Trustee Allowance Fund] policy or the law</u>."[12] (Emphasis added.)

These internal policies and guidance requiring trustee compliance with both the Ethics Code and furthering OHA's mission suggest that the Ethics Code merely sets a floor for trustee conduct. HRS chapter 10 in turn provides the Board discretion to establish policies and procedures to ensure trustees also comply with their fiduciary obligations to OHA beneficiaries.

---

[12] The record also demonstrates that OHA personnel carried out their work under the assumption that the Ethics Code applied to trustees. In addition to attending in-person ethics trainings and filing public financial disclosures as required under HRS chapter 84, Board members also attended workshops facilitated by their counsel that discussed trustees' obligations under HRS chapter 84. OHA's then-corporate counsel also testified that HRS chapter 84 "was totally applicable to office trustees" and recounted the "numerous ways" they took steps to ensure trustees complied with the Ethics Code, primarily through amending the Executive Policy and Board Operations Manuals.

Indeed, government employees are sometimes subject to stricter standards of conduct that may not otherwise violate the Ethics Code.  E.g., Advisory Opinion No. 1976-241, 1976 WL 452404, at *2 (Haw. Ethics Comm'n Jan. 21, 1976) (opining that while HRS chapter 84 would not restrict a member of a State board to participate in decisions relating to proposals made by his employer, other applicable statutory and case law may impose more restrictive conflict of interest standards the board member must follow).  In those circumstances, the Commission has emphasized that HRS chapter 84 "sets a minimum standard of conduct for state officials and employees."  Informal Advisory Opinion Nos. 2004-4 Through 2004-15, 2004 WL 7346661, at *2 (Haw. Ethics Comm'n Oct. 20, 2004); see also Advisory Opinion No. 2017-02, 2017 WL 2694532, at *5 (Haw. Ethics Comm'n Feb. 16, 2017).  The Ethics Code similarly "sets a minimum standard of conduct" for OHA trustees.

### 3. Akana's fiduciary obligations do not exempt her from compliance with the Ethics Code

Akana next contends that because OHA trustee conduct "can be reviewed only for abuse of discretion," under Kealoha v. Machado, 131 Hawai'i 62, 77-78, 315 P.3d 213, 228-29 (2013), courts "cannot interfere with [her] exercise of discretionary power without first finding a breach of fiduciary duty." Therefore, Akana argues, the Commission cannot punish her for

Ethics Code violations because trustee expenditures can only be reviewed by courts when an OHA beneficiary brings a breach of fiduciary duty claim.

Akana's reliance on Kealoha is inapt.  There, native Hawaiian[13] OHA beneficiaries brought a lawsuit under HRS § 10-16(c) (2009),[14] alleging the Board members breached their fiduciary duty by spending funds to support various Hawaiian causes and organizations without considering blood quantum.  131 Hawaiʻi at 71, 315 P.3d at 222.  In determining that a breach of OHA trustees' fiduciary duty "occurs when the trustees' decision conflicts with the purpose of bettering the conditions of native Hawaiians," we held that trustee expenditures "are to be reviewed for abuse of discretion."  Id. at 77-78, 315 P.3d at 228-29.

When we applied the abuse of discretion standard in Kealoha, it was a case where OHA beneficiaries brought a breach of fiduciary duty claim and the expenditures were approved by

---

[13]    For purposes of the discussion of Kealoha in this opinion, "native Hawaiian" refers to individuals with at least 50% Hawaiian ancestry while "Hawaiian" refers to individuals with some Hawaiian ancestry, but less than the 50% required to be a native Hawaiian under the Hawaiian Homes Commission Act.  Kealoha, 131 Hawaiʻi at 64 n.2, 315 P.3d at 215 n.2; see Hawaiian Homes Commission Act of 1920, Pub. L. 67-34, 42 Stat. 108 § 203 (defining "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778").

[14]    "In matters of misapplication of funds and resources in breach of fiduciary duty," HRS § 10-16(c) provided that trustees are "subject to suit brought by any beneficiary of the public trust entrusted upon the office, either through the office of the attorney general or through private counsel."

the Board.  See id. at 67 nn.14-16, 315 P.3d at 218 nn.14-16.

Unlike Kealoha, the instant case is neither an action for breach

of fiduciary duty under HRS § 10-16(c) nor were Akana's trustee

expenditures at issue approved by the full Board.  Rather, the

instant action was brought as a charge under the Ethics Code and

concerns Akana's individual conduct and the personal benefits

and conflicts of interest issues it raised.  As discussed above

in Part IV.A.1, the plain text and legislative histories of HRS

chapters 10 and 84 do not suggest that the trustees of a state

entity are exempt from the Ethics Code simply because they hold

fiduciary obligations.  The Commission correctly notes that

"[t]here is no reason that [OHA] trustee[s'] fiduciary duties

cannot co-exist alongside [their] obligations to act in

accordance with the [Ethics Code]."  See Restatement (Third)

Trusts § 76(1) (2007) ("The trustee has a duty to administer the

trust, diligently and in good faith, in accordance with the

terms of the trust and applicable law.").

We therefore hold that Akana's role as a trustee does

not exempt her from compliance with HRS chapter 84.  Rather, an

Ethics Code charge is a separate cause of action from a breach

of fiduciary duty claim.  The former arises from the ethical

obligations Akana owes to the public as a state employee, while

the latter arises from her fiduciary duties to OHA

beneficiaries.

### 4. Although Ethics Code violations are separate actions from breach of fiduciary duty claims, the Commission should defer to OHA policy

Amicus curiae OHA raises the concern that should the Commission be able to charge OHA trustees with Ethics Code violations, "the Commission could, intentionally or not, influence trustees to act in a way that is in accordance with the Commission's expectations but in breach of the trustees' duty of loyalty to OHA's beneficiaries[.]"[15] While we conclude that, as the HRS currently stand, OHA trustees are subject to the Ethics Code and the Commission's jurisdiction, we also recognize that the Board was given broad powers to fulfill the office's responsibility to better the conditions of Native Hawaiians. See HRS § 10-4 (authorizing the Board "[t]o take such actions as may be necessary or appropriate to carry out the powers conferred upon it by law," such as acquiring real property, entering contracts, issuing revenue bonds, and determining its own expenditures). As a result, OHA trustees carry out duties distinct from the responsibilities of other members of state boards and commissions. See, e.g., HRS

---

[15] OHA, as amicus curiae, argues the Commission lacks jurisdiction over its trustees and urges this court to apply Kealoha's abuse of discretion standard to individual trustee expenditures. OHA contends that the Commission's oversight of trustee conduct "may impact or impede OHA and its trustees from fulfilling their duties." For the reasons discussed above in Part IV.A.3, we decline to apply Kealoha's abuse of discretion standard to the charge against Akana, and further address OHA's concerns in the section below.

§ 10-4(1) (providing the OHA Board the general power "[t]o adopt, amend, and repeal bylaws governing the conduct of its business and the performance of the powers and duties granted to or imposed upon it by law").

The Commission, in adjudicating Ethics Code charges against OHA trustees, should consider OHA's bylaws that "govern[] the conduct of its business." See id. Therefore, where OHA policy permits trustees broader discretion to carry out their official duties than other state officials and employees, the Commission must defer to the guardrails set in place by OHA.

The Commission did so here. OHA policy permitted trustees to use Trustee Allowance Funds for "incidental expenses connected with Trustee duties," such as "developing and maintaining an ongoing communication network with beneficiaries and the general public"; "promoting a broader understanding of Hawaiian issues"; and "provid[ing] support for beneficiaries in their personal quest for self-improvement, capacity building, and for education[.]" These permitted expenditures are unique to OHA's purpose under HRS § 10-3 and likely extend beyond the scope of discretionary spending permitted in other state entities.

The Commission properly deferred to OHA policy. Where the Commission determined Akana violated the fair treatment law,

HRS § 84-13, for 41 of the 47 counts alleged by the Commission's charge counsel, it further found that the 41 counts were also in violation of OHA policy. For example, in assessing Akana's food expenses, the Commission noted that although OHA did not have specific policies for food expenses, "OHA fiscal staff's understanding of the policy was that Trustees could spend Trustee Allowance funds on food for meetings with outside beneficiaries, but not for internal meetings with staff." It therefore found Akana's food expenditures for staff parties or other "purely internal functions" were "personal expense[s] rather than an expense that was necessary or required for OHA business."

Likewise, where the Commission declined to find a fair treatment law violation, it deferred to OHA policy. For example, the Commission declined to find Akana violated the fair treatment law when she donated a total of $75.00 to the Hawaiian Humane Society because it was "unclear whether OHA policy at the time prohibited [her] from making the donations." It observed that although charitable contributions to the Hawaiian Humane Society "did not necessarily align with the intent of the Trustee Annual Allowance," it could have been allowable under OHA policy if the "organization specifically tracked its services to the Native Hawaiian community."

Under these circumstances, the Commission properly deferred to OHA policy in considering Akana's Trustee Allowance Fund expenditures, ensuring OHA trustees would be able carry out their fiduciary duties free from undue influence, while also ensuring Akana's conduct as a state employee would be accountable to the public.[16]

## B.  Akana Violated the Gifts and Gifts Reporting Laws

We now turn to the Commission's findings and conclusions that Akana violated the gifts and gifts reporting laws, HRS §§ 84-11 and -11.5, by (1) accepting two legal fee payments from OHA beneficiary Kawānanakoa after Kawānanakoa filed a lawsuit against OHA, and (2) failing to disclose her acceptance of four legal fee payments before the statutory deadline.  Reviewing the Commission's mixed findings of fact and conclusions of law for clear error, we hold (1) Akana's acceptance of legal fees payments from Kawānanakoa were "gifts" under HRS § 84-11, and (2) the Commission's determination that Akana violated the gifts and gifts reporting laws was not clearly erroneous.

### 1. Akana's acceptance of paid legal fees are "gifts"

Akana contends the legal fee payments from Kawānanakoa were not "gifts" because her lawsuit against OHA was part and

---

[16]    This case does not require us to determine the outer limits of what OHA policy could allow, and we decline to do so here.

parcel of her official duties.  She cites to HRS § 10-5(3), which provides the Board "the power in accordance with law to . . . [c]ollect, receive, deposit, withdraw, and invest money and property on behalf of the office."  (Emphasis added.)  As trustee, Akana contends she received paid legal fees from Kawānanakoa on behalf of the office.

The Board, however, did not authorize Akana to file her September 2013 lawsuit, which she filed both in her official and individual capacities.  Further, nothing in HRS chapter 10 suggests that Akana, or other OHA trustees, are authorized to bring individual actions against the Board in their official capacity.  See HRS § 10-16(a) (2009) ("The office may sue and be sued in is corporate name.").  Akana therefore did not accept the legal fee payments from Kawānanakoa on behalf of the Board, and was not authorized to do so under HRS § 10-5(3).  Rather, Akana's acceptance of paid legal fees from Kawānanakoa constituted acceptance of a gift subject to the gifts and gifts reporting laws.  See Advisory Opinion No. 2018-002, 2018 WL 4599569, at *2 (Haw. Ethics Comm'n June 21, 2018) (concluding pro bono legal services are considered "gifts" under the Ethics Code because they "are services that have a monetary value").

41

## 2. The Commission did not err in determining Akana violated the gifts laws for accepting paid legal fees <u>after</u> Kawānanakoa filed a lawsuit against OHA

In any event, the plain language of the gifts law does not differentiate between "gifts" received in one's official capacity and those that are unrelated to those duties:

> No legislator or employee shall solicit, accept, or receive, directly or indirectly, any gift, whether in the form of money, service, loan, travel, entertainment, hospitality, thing, or promise, or in any other form, under circumstances in which <u>it can reasonably be inferred</u> that the gift is intended to influence the legislator or employee in the performance of the legislator's or employee's official duties or is intended as a reward for any official action on the legislator's or employee's part.

HRS § 84-11 (emphasis added).

Instead, the gifts law focuses on whether "it can reasonably be inferred" to affect state employees' performance of their official duties. The Commission considers three factors in determining whether a gift is prohibited under HRS § 84-11: "(1) the value of the gift; (2) the relationship between the recipient and the donor of the gift, including whether the recipient takes official action with respect to the donor; and (3) whether the gift benefits the recipient personally or serves legitimate state interests." <u>Advisory Opinion No. 2018-002</u>, 2018 WL 4599569, at *2.

Akana points to a 2018 advisory opinion by the Commission, in which it applied the three-factor test to a State board member's acceptance of pro bono legal services from two attorneys. <u>Id.</u> There, a State board member asked the

42

Commission in relevant part to advise him as to whether he may accept pro bono legal services provided to him in his individual capacity in connection with a lawsuit concerning the state board on which he served.  Id. at *1.  After the state agency became involved in a lawsuit, an attorney to the state board recommended that all board members retain private legal counsel regarding the lawsuit.  Id.  Acting on the board attorney's recommendation, the board member asked two attorneys to co-represent him pro bono in his individual capacity, to which they agreed.  Id.

The Commission described the circumstances as a "close case" and concluded that while pro bono legal services were considered gifts under the Ethics Code, the board member's acceptance of those legal services did not violate the gifts law.  Id. at *3.  It concluded the first factor – the monetary value of the pro bono legal services, which were valued at several thousand dollars – was substantial and weighed against acceptance.  Id. at *2.

The Commission considered the second factor – the relationship between the board member and the donors – "the most important of the three."  Id. at *3.  Determining that this factor leaned in favor of acceptance, the Commission noted that the board member had a personal friendship with both attorneys that pre-dated the board member's position with the State.  Id.

43

It also reasoned that neither attorney was currently involved in matters the board member was considering in his official capacity. Id. Although one of the attorneys was involved in a separate lawsuit with the entire board, the Commission explained the board member's "prompt and unequivocal steps to avoid taking official action affecting the Lawsuit, and hence, affecting Attorney A" rendered it unlikely that the gifts of pro bono legal services would influence the board member's official actions. Id.

The 2018 Commission explained that the third factor – the extent to which the gifts benefit the board member personally or benefit the State – was "complex." Id. The Commission pointed out that the legal services were being provided to the board member in his individual capacity, but legal services were required only because he served as member of a State board. Id. It concluded that under the specific circumstances where all board members were advised to obtain private legal representation in their individual capacities, the board member's solicitation and acceptance of pro bono legal services weighed in favor of acceptance. Id. Concluding two of the three factors weighed in favor of acceptance, the Commission determined the board member's acceptance of pro bono legal services was permissible under the gifts law. Id.

44

Walking through the three-factor gifts law analysis, Akana argues that none of the factors were met. First, she contends that the acceptance of legal fees had "no true value" to her. Second, she asserts that the record is clear: no relationship existed between her and Kawānanakoa prior to her acceptance of paid legal fees. Third, Akana emphasizes that the Commission made no finding as to whether her acceptance of legal fees weighed in favor or against acceptance. She argues that "even without a clear record on the third factor," her lawsuit was for the benefit of OHA beneficiaries' access to Board meetings and materials, which benefits the State and OHA's mandate to advance the betterment of Native Hawaiians.

Contrary to Akana's position that the three factors were not satisfied here, we conclude the Commission did not clearly err when it determined two of the three factors heavily weighed against acceptance and therefore Kawānanakoa paying for Akana's legal fees after Kawānanakoa initiated her own lawsuit created the reasonable inference "that the gift is intended to influence [Akana] in the performance of [her] official duties or is intended as a reward for any official action on [Akana's] part." (Quoting HRS § 84-11.)

First, the substantial value of the gift – a donation of legal fees in excess of $21,000 after Kawānanakoa filed her own lawsuit against OHA – clearly weighs against acceptance,

45

regardless of whether Akana felt the legal fees had "no true value" to her. See Advisory Opinion No. 2018-002, 2018 WL 4599569, at *2 (determining pro bono legal services valued at several thousand dollars was "substantial" and weighed against acceptance under the first factor of the gifts law analysis).

Second, the relationship between Akana and Kawānanakoa also weighs against acceptance. Akana does not challenge the Commission's findings that she had no relationship with Kawānanakoa outside her role as OHA trustee. Rather, she emphasizes her trustee-beneficiary relationship with Kawānanakoa. However, the fact that Akana had no significant relationship with Kawānanakoa before her lawsuit supports the inference that Kawānanakoa paid Akana's legal fees to influence the position taken by Akana as an OHA trustee. Notably, unlike the board member's acceptance of pro bono services in the Commission's 2018 Advisory Opinion, the record here does not indicate Akana took "prompt and unequivocal steps to avoid taking official action affecting" Kawānanakoa's lawsuit against OHA. Cf. id. at *3 (noting the second factor leaned towards the gift of pro bono legal services being acceptable because based on the circumstances, it was unlikely the gifts of pro bono legal services would influence or reward the board member for any official action he might take).

46

Though the Commission did not expressly conclude the third factor – the extent to which the gifts benefit the employee personally or benefit the State – weighed against Akana's acceptance of paid legal fees, we concur with the Commission's determination that the first two factors sufficiently weigh against acceptance of Kawānanakoa's gifts.

Kawānanakoa's gifts of paid legal fees may have initially been permissible under the gifts law because acceptance of the gifts from an OHA beneficiary with no other pending matters would not give rise to an inference that the gift was "intended to influence" Akana in her performance as OHA trustee. Notably, the Commission's charge counsel only charged Akana for violating the gifts law after Kawānanakoa filed a separate lawsuit against OHA, suggesting Akana's initial acceptance of paid legal fees from Kawānanakoa prior to February 2017, may have been permissible under the gifts law.[17]

The nature of Kawānanakoa's relationship with Akana, however, changed once Kawānanakoa initiated her own lawsuit

---

[17] The initial charge against Akana alleged Akana violated the gifts law on seven separate occasions for accepting paid legal fees from Kawānanakoa from July 2015 through June 2017. However, in a "Further Statement of Alleged Violation" by the Commission's charge counsel, Akana was only alleged to have violated two counts of the gifts law for her April 28, 2017 acceptance of $15,513.15 and June 17, 2017 acceptance of $6,000.00 of legal fees from Kawānanakoa.

against OHA.[18]  Rather than disclose her acceptance of paid legal fees from Kawānanakoa or take other "prompt and unequivocal steps to avoid taking official action affecting" Kawānanakoa's lawsuit against OHA, Akana attended at least one executive session about the Kawānanakoa lawsuit.  Cf. id.  Even if Akana's participation in one executive session with the Board's counsel did not result in her taking any official action on Kawānanakoa's lawsuit, Akana's failure to either disclose her acceptance of paid legal fees from Kawānanakoa or recuse from taking part in any discussions related to Kawānanakoa's lawsuit weighs heavily against acceptance.  Therefore, Akana's acceptance of Kawānanakoa's legal fee payments after the filing of the Kawānanakoa lawsuit gave rise to the inference that Kawānanakoa's continued payment of Akana's legal expenses were "intended to influence [Akana] in the performance of [her] official duties."  See HRS § 84-11.

### 3. The Commission did not err in determining Akana violated the gifts reporting law

Distinct from the gifts law, the gifts reporting law requires state employees to report certain gifts on an annual basis, though the reporting of gifts does not transform an

---

[18]    Akana was present for an entire executive session of the Board on March 9, 2017, in which the Board consulted with its attorney regarding Kawānanakoa's lawsuit.  At this time, Akana had not yet filed any gift reporting statements nor did she take "prompt and unequivocal steps to avoid taking official action affecting" Kawānanakoa's lawsuit.

otherwise unacceptable gift into an acceptable one.  See HRS
§ 84-11.5(f) (noting the gifts reporting provision "does not
affect the applicability" of the gifts law).  To promote public
confidence in government and public officials, the gifts
reporting law mandates disclosure of:

> (1)   [A]ny gift or gifts valued singly or in the aggregate
>        in excess of $200, whether the gift is in the form of
>        money, service, goods, or in any other form;
>
> (2)   The source of the gift or gifts have interests that
>        may be affected by official action or lack of action
>        by the . . . employee; and
>
> (3)   The gift is not exempted by subsection (d) from
>        reporting requirements[.]

HRS § 84-11.5(a); see Conf. Comm. Rep. No. 41, in 1992 House
Journal, at 808 (noting that while a "slight inconvenience, the
filing of gift disclosure statements are necessary to further
promote public confidence in our government as well as our
public officials").

As the Commission properly concluded, Akana's
acceptance of paid legal fees from Kawānanakoa met all three
conditions requiring disclosure: (1) the gifts were valued well
over $200, (2) the gifts were from Kawānanakoa, an OHA
beneficiary whose interests may have been affected by Akana's
duties as an OHA trustee, and (3) the acceptance of paid legal
fees was not exempted from the reporting requirement.  Yet,
Akana did not file any gifts disclosure statement with the
Commission disclosing her acceptance of four installments of

paid legal fees from July 2015 through June 2016 totaling more than $50,000 from Kawānanakoa until June 2017, nearly one year after the statutory gifts reporting deadline.[19] We therefore conclude, given the evidence in the record, that the Commission did not clearly err in determining Akana violated the gifts and gifts reporting laws.

## V. CONCLUSION

For the foregoing reasons, we affirm the ICA's February 16, 2024 Judgment on Appeal affirming the Circuit Court of the First Circuit's November 27, 2019 Amended Final Judgment and the Hawai'i State Ethics Commission's February 5, 2019 Findings of Fact, Conclusions of Law, and Decision and Order.

| | |
|---|---|
| James J. Bickerton<br>Geoffrey A. Tracy<br>(Bridget G. Morgan-Bickerton<br>and Stephen M. Tannenbaum<br>on the briefs)<br>for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Sabrina S. McKenna<br><br>/s/ Todd W. Eddins<br><br>/s/ Lisa M. Ginoza |
| Ewan C. Rayner<br>for respondent | /s/ Vladimir P. Devens |
| Robert G. Klein<br>Kurt W. Klein<br>David A. Robyak<br>James M. Yuda<br>Jason W. Jutz<br>Mallorie C. Aiwohi<br>(on the briefs)<br>for amicus curiae | |

---

[19] As previously noted, Akana accepted four installments of paid legal fees from Kawānanakoa in July 2015, August 2015, March 2016, and April 2016. The statutory deadline to disclose acceptance of those gifts was June 30, 2016.